IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES and LORI HENDRIX,            :
                                   :
          Plaintiffs,              :
                                   :          Civil No. 2:09 cv 132
          v.                       :          Judge Gregory L. Frost
                                   :          Magistrate Judge Mark R. Abel
UNITED STATES OF AMERICA,          :
                                   :
          Defendant.               :

_____

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AGAINST THE UNITED STATES

_____

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Plaintiffs, James and

Lori Hendrix, by and through counsel, hereby move for an order granting summary judgment in

their favor as a matter of law against the United States.  There are no material facts in dispute

and the Plaintiffs are entitled to judgment as a matter of law.  The reasons supporting this Motion

are more fully set forth in the attached memorandum.

Respectfully submitted,

/s/ Terrence A. Grady
Terrence A. Grady (0020845)
Trial Attorney
Terrence A. Grady & Associates Co., L.P.A.
100 East Broad Street, Suite 2310
Columbus, Ohio 43215
Telephone:  614.849.0378
Facsimile:  614. 849.0379
Email: tgradyattgradylaw.com
Attorneys for Plaintiff

# INDEX

Page

MOTION OF THE PLAINTIFFS FOR SUMMARY JUDGMENT .......................i

BRIEF OF THE PLAINTIFFS IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT ...............................................................................................1

QUESTIONS PRESENTED....................................................................1

SHORT ANSWERS ............................................................................2

I.      Statement of the Case.....................................................................2

II.     Outline of Relevant Facts...............................................................12

        A.      The Plaintiffs, Their Residence, and the Decision and Process to
                Donate Their Residential Structure to the Upper Arlington
                Fire Department .................................................................12

        B.      Exploration and Confirmation of Potential Incidental
                Tax Benefits .....................................................................15

        C.      Qualified Real Estate Appraisal.........................................17

        D.      The Burn Contract and Charitable Contributions .............18

        E.      The Fire Department and Other Law Enforcement Agencies'
                Utilization of the Donated Residential Structure ..............20

        F.      The Immense and Almost Immeasurable Training Benefits that
                Inure to the Fire Department as a Result of this Contribution..........26

        G.      The Hendrixes' 2004 Tax Reporting and Claiming Charitable
                Contribution Deduction ...................................................28

        H.      The IRS Audit and IRS Position in Disallowance of the
                Charitable Contribution Deduction...................................29

LAW AND ANALYSIS

III.    Standard for Summary Judgment....................................................29

IV.     This Charitable Contribution Deduction is Allowed Under I.R.C.

       Section 170 As Interpreted by <u>Scharf v. Comm'r</u>........................................30

     A.     I.R.C. Section 170(a)(1)..................................................................30

     B.     <u>Scharf v. Commissioner</u>, T.C. Memo 1973-265 (1973) .................31

     C.     IRS's Acquiescence of the <u>Scharf</u> Decision .....................................32

     D.     <u>Rolfs v. Commissioner</u>, Tax Court Docket No. 9377-04 ................33

V.    Interpretation and Application of I.R.C. Section 170(f)(3) – The Partial Interest Issue………… ................................................................................36

     A.     The Partial Interest Provisions of I.R.C. §170(f)(3) Do Not Apply to Hendrixes' Contribution .....................................................37

     B.     The Hendrixes Contributed Their Entire Interest to the Upper Arlington Fire Department..................................................................43

     C.     The Hendrixes Did Not Merely Allow the Fire Department to "Use" the Structure ........................................................................47

VI.   Substantiation and Documentation Requirements for a Charitable Contribution           ................................................................................50

     A.     Substantiation and Documentation Requirements ...........................51

          1.     Qualified Appraisal Requirement .........................................51

          2.     Written Acknowledgment Requirement ...............................56

     B.     Substantial Compliance Doctrine ....................................................58

CONCLUSION.................................................................................................64

LIST OF EXHIBITS........................................................................................65

CERTIFICATE OF SERVICE ........................................................................67

# CITATIONS

## Cases

Alexander v. Buckeye Pipeline Co., 53 Ohio St. 2d 241, 246 (1978) .......................................... 57
Baccei v. United States, N.D. CA No. C 07-5329 PJH, 2008 U.S. Dist. LEXIS 50687 at *20
  (N.D. CA June 26, 2008). ................................................................................................. 59
Bond v. Comm'r, 100 T.C. 32 (1993)................................................................... 59, 60, 63
Bradley v. Austin, 841 F.2d 1288 (6th Cir. 1988) ........................................................ 37
Bradley v. Austin, 841 F.2d 1288, 1293 (6th Cir. 1988) .............................................. 38
Bruzewicz v. United States, 604 F. Supp. 2d 1197 (N.D. IL 2009) ...................................... 62, 63
Celotex v. Catratt, 477 U.S. 317, 327 (1986) ............................................................. 30
Cincinnati College v. Yeatman, 30 Ohio St. 276 (1876).................................... 45, 46, 47
Commissioner v. Duberstein, 368 U.S. 278, 80 S. Ct. 1190, 4 L Ed. 2d 1218 (1960). ............... 33
D.J. Lee, M.D., Inc. v. Commissioner, 931 F.2d 418, 420 (6th Cir. 1991) ................................ 38
Drye v. U.S., 528 U.S. 49, 58 (1999)........................................................................ 44
Estate of Gunland v. Commissioner, 88 T.C. 1453 (1987).................................................. 59
F.E. Schumacher Company v. United States, 308 F. Supp. 2d 819 (N.D. Ohio 2004) ............... 62
Hartwick College v. United States, 801 F.2d 608, 65 (2d Cir. 1986)..................................... 38
Helvering v. Bliss, 293 U.S. 144, 150-51, 79 L.Ed. 246, 55 S. Ct. 17 (1934) ............................ 38
In re Lucas, 924 F.2d 597, 601 (6th Cir. 1991) ............................................................ 38
Kelly v. Medical Life Insurance Co., 31 Ohio St. 3d 130, *paragraph one of syllabus* (1987)..... 57
Logan v. Commissioner, TC Memo 1994-445 (1994) ................................................... 41
Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 585-586 (1986)........ 30
McBarron v. S & T Industries, Inc., 771 F.2d 94 (6th Cir. 1985) ..................................... 38
Peters v. Commissioner, TC Memo 1976-170.......................................................... 39, 40
Porter v. Comm'r, 288 U.S. 436, 442, 77 L.Ed. 880, 53 S. Ct. 451 (1933)................................ 38
Prussner v. United States, 896 F.2d 218, 224 (7th Cir. 1990) ...................................... 62
Rolfs v. Commissioner, Tax Court Docket No. 9377-04 ............................................. 6, 34
Sawyer v. County of Sonoma, 719 F.2d 1001, 1008 (9th Cir. 1983) .......................... 59
Scharf v. Comm'r, T.C. Memo 1973-265 (1973). .......................................... 6, 7, 16, 31, 32, 33
Shifrin v. Forest City Ent., 64 Ohio St. 3d 635, 638 (1992) ......................................... 57
Stark v. Commissioner, 86 T.C. 243 (1986)............................................................ 39, 40
Stjernholm v. Comm'r, 10th Cir. No. 90-9012, 1991 U.S. App. LEXIS 11639 (10th Cir. May 22,
  1991). .......................................................................................................... 41
Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989)........................................ 30
Tara v. Comm'r, 67 T.C. 1071, 1077-1078 (1977)........................................................ 60
Taylor v. Commissioner, 67 T.C. 1071, 1077-1078 (1977) ....................................... 59, 63
United States v. National Bank of Commerce, 472 U.S. 713, 727 (1985) ................................. 44
Weingarden v. Commissioner, 825 F.2d 1027 (6th Cir. 1987): ..................................... 38

## Other Authorities

AOD LEXIS 17, March 20, 1974 ............................................................................ 32
Rule 56(c) of the Federal Rules of Civil Procedure.................................................... 30

**Statutes**

Internal Revenue Code Section 170

Internal Revenue Code Section 2055(c)(2)

Internal Revenue Code Section 2522(c)(2)

**Regulations**

Treasury Regulation Section 1.170A-7

Treasury Regulation Section 1.170A-13

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES & LORI HENDRIX | : | |
| | : | |
| Plaintiffs, | : | CASE NO. |
| | : | |
| v. | : | JUDGE FROST |
| | : | |
| UNITED STATES, | : | MAGISTRATE ABLE |
| | : | |
| Defendant. | : | |

---

**BRIEF OF THE PLAINTIFFS JAMES & LORI HENDRIX
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

## QUESTIONS PRESENTED

1.  Plaintiffs, James and Lori Hendrix donated their residence to the Upper Arlington Fire Department for training and burn down exercises.  The Hendrixes' claimed a tax deduction for a charitable contribution of their residence on their 2004 federal tax return, based on the appraised value of their residential structure.  Are the plaintiffs entitled to the charitable deduction under I.R.C. §170(a)?

2.  Pursuant to I.R.C. §170(f)(3), if taxpayers only contribute a partial interest in property or only convey the right to use the property, a charitable contribution deduction will be denied.  Does this provision of the Tax Code apply to the Hendrixes' donation of their residence to the Upper Arlington Fire Department?

3.  The Upper Arlington Fire Department conducted training and burn down exercises with the Hendrixes' residence after the Hendrixes gave the structure to them and for approximately five months thereafter.  The Fire Department then completely destroyed the structure by burning it down.  Did the Hendrixes contribute a partial or an entire interest in their residence when they surrendered all rights, dominion and control of their residential structure to the Fire Department to conduct training and burn down exercises, rendering their residence uninhabitable?

4.      Under the provisions of the Tax Code, taxpayers are required to document and substantiate charitable contributions that are greater than $5,000. The Hendrixes' claimed charitable contribution exceeded this amount and they provided substantial documentation of their contribution.   Was the Hendrixes' substantial compliance sufficient under the pertinent provisions of the Internal Revenue Code and Treasury Regulations?

## SHORT ANSWERS

1.      The Plaintiffs are entitled to the charitable contribution deduction they claimed on their 2004 federal income tax return for the contribution of their residential structure to the Upper Arlington Fire Department.  The donation of their residential structure to a political subdivision related to a governmental function meets all of the requirements of a charitable contribution under I.R.C. Section 170.

2.      Neither the express terms of I.R.C. Section 170(f)(3) nor its legislative history related to the purpose of its enactment support its application to this type of donation.  The express purpose for the enactment of this statute was to limit and prelude the effect of a double tax benefit.  This double tax benefit results where the taxpayer retains an interest in the property.  By giving the donee only a partial interest in the property or the use of the property, the taxpayer could avoid claiming any income that would have otherwise been generated by the property and could get another tax benefit by taking a deduction for the charitable contribution.  Here, when the donation was made, the Taxpayers forever gave away any and all rights of ownership in the structure.

3.      Alternatively, even if I.R.C. Section 170(f)(3) were applicable to this type of charitable contribution, it is not applicable here because the Taxpayers donated their "entire interest" in their residential structure to the Fire Department and they did not merely allow the Fire Department the "use" of their property.  Upon making this donation, it was intended and contemplated that they no longer had any further rights, dominion, or control over this property.  The Taxpayers did not retain any substantial interests in the property.   The Fire Department had all of the rights and complete and unbridled dominion and control over the donated property, including the right to completely destroy it by any means, including burning it down.

4.      The Plaintiffs substantially complied with all of the documentation and substantiation requirements of I.R.C. Section §170 to qualify as a charitable contribution deduction.


## I.      STATEMENT OF THE CASE.

          This is a tax refund case.  The Plaintiffs (also referred to as the "Taxpayers") are seeking

a refund of the income taxes they paid the Internal Revenue Service ("IRS") in the amount of

$125,053.  The refund sought pertains to the IRS's disallowance of a charitable contribution deduction of $287,400 that the Taxpayers claimed on their 2004 federal income tax return.  The charitable deduction related to their donation of their residence to the Upper Arlington Fire Department ("Fire Department") for training and burn down exercises.  The Taxpayers paid the additional tax and interest owing as a result of the IRS's disallowance of the claimed charitable contribution, filed an administrative claim for refund with the IRS, and then initiated this litigation seeking a refund of the taxes they paid.

The IRS audited the Taxpayers' 2004 tax return and disallowed the charitable deduction on the basis that this type of deduction was precluded by the application of the provisions of I.R.C. Section 170(f)(3).  If applicable to this type of charitable contribution, I.R.C. Section 170(f)(3) precludes a charitable contribution deduction for donations of only a "partial interest in property."  Additionally, Section 170(f)(3) also precludes a deduction if the donor only allows the donee to "use" the property.

With regard to the Plaintiffs' charitable contribution, the IRS contends that I.R.C. Section 170(f)(3) precludes a charitable contribution deduction since the Plaintiffs only donated their residential structure and not the land the structure sits on and, as such, they only donated a "partial interest" in their property.  Alternatively, the IRS contends that since the residential structure was "returned back" to the Plaintiffs (albeit after it was completely burned down to the ground and completely destroyed), the Plaintiffs only let the Fire Department "use" the structure.  Only allowing the donee the "use" of property would also preclude a deduction under I.R.C. Section 170(f)3).

During the administrative appeal with the IRS, the IRS raised another basis for the disallowance of the deduction.  Specifically, the IRS raised a valuation theory.  Despite the

3

Taxpayers' having obtained a qualified appraisal documenting the fair market value of the residential structure at the time of the donation, the IRS contends that the value of the contribution should be substantially less than its appraised fair market value based upon some alternative valuation methodology since the property was going to be burned down.

Lastly, in this litigation, the IRS raised yet another theory to attempt to preclude this deduction. Specifically, the IRS recently began challenging the deduction on the theory that the Plaintiffs' deduction is precluded because they did not strictly comply with the substantiation requirements under I.R.C. Section 170 related to identifying and documenting this particular type of charitable contribution.

The issues in this case are (i) whether the Taxpayers are entitled to a charitable contribution deduction under I.R.C. Section 170 related to their contribution of their residential structure to the Upper Arlington Fire Department; (ii) whether I.R.C. Section 170(f)(3) is applicable to this type of contribution; (iii) if Section 170(f)(3) is applicable, did the taxpayers give their "entire interest" in their residential structure to the Fire Department or did the Taxpayers only give the Fire Department the "use" of their residential structure; (iv) whether the Taxpayers complied with the substantiation requirements of the Code related to their claiming and documenting their charitable contribution; and (v) if the Taxpayers are entitled to a charitable contribution, does the amount of the charitable contribution deduction they claimed on their return (based upon their contemporaneous appraisal of the fair market value of the residential structure) represent the actual fair market value of the residential structure donated to the Upper Arlington Fire Department.

As is documented in the Court's July 7, 2009 Preliminary Pretrial Order, the parties agreed to bifurcate issues (i) through (iv) above from the valuation issue identified in (v) above.

In this regard, the parties agreed to proceed with discovery with regard to issues (i) through (iv) and then file dispositive motions with the Court on those issues.  If the Defendant United States prevails on the motions for summary judgment, then that concludes the case at this level.  If the Plaintiffs prevail on these issues, then the parties will resume discovery and pursue resolution of the valuation issue.  Thus, this motion only relates to the determination of issues (i) through (iv) above.  The Court's determination of the valuation issue is deferred until after those issues are determined by the Court.

Until very recently, the charitable contribution deductions claimed by taxpayers that made contributions of residential structures to community fire departments had not been challenged by the IRS.[1]  Thus, while the narrow issue in this case is to determine if the Hendrixes are entitled to claim this 2004 charitable contribution deduction, this case and the Court's determination has far wider implications than just the Hendrixes' allowance of their deduction.  This is a case of first impression in the federal courts related to the IRS's position that I.R.C. Section 170(f)(3) applies to these types of contributions and, if so, the issues of whether the Plaintiffs donated their entire interest in their residential structure or only granted the Fire Department the right to use their property.  Although I.R.C. Section 170(f)(3) was enacted in 1969, the IRS has never applied it to these types of charitable contributions since its enactment and for the next almost three decades.  Rather, the IRS has allowed these deductions under the general provisions governing gifts to charities and political subdivisions under I.R.C. Section 170(a) and on the basis of well established and settled case law.

---

[1] As will be explained in detail herein, these types of charitable contribution deductions must be evidenced and documented on the personal tax return by the inclusion of a special form used for this particular purpose.  This form specifically identifies for the IRS the exact type and nature of the contribution and is signed by the appraiser and the donee organization.  Thus, it would be nonsensical for the IRS to suggest that these deductions over the last thirty five years or so (at least since the enactment of I.R.C. Section 170(f)(3) in 1969) was the result of the IRS not being aware of these claimed deductions on taxpayers' returns.

As legal support for claiming a charitable contribution for a residential structure donated to local fire departments for training and burn down exercises, taxpayers and their tax advisors relied upon well settled law set forth in the 1973 United States Tax Court decision of <u>Scharf v. Comm'r</u>, T.C. Memo 1973-265 (1973). In its opinion in <u>Scharf</u>, the Tax Court squarely held that a charitable contribution of a residential structure to a local fire department for burn exercises qualified as a charitable contribution under I.R.C. Section 170.[2]

With the one exception of a yet undecided case in the Tax Court of <u>Rolfs v. Commissioner</u>, Tax Court Docket No. 9377-04, counsel has not located any other court cases challenging this specific type of contribution. Even though I.R.C. Section 170(f)(3) was enacted in 1969, <u>Rolfs</u> appears to be the very first challenge to these types of contributions by the IRS attempting to apply I.R.C. Section 170(f)(3) and alternatively attacking the fair market valuation methodology of these contributions. <u>Rolfs</u> involved taxpayers who, in 1998, contributed a house to a fire department for purposes of fire training exercises and claimed a charitable contribution deduction for the value of the structure on their 1998 federal income tax return. The IRS disallowed the taxpayers' charitable contribution deduction based primarily upon the application of I.R.C. Section 170(f)(3) and also upon the IRS's alternative theory of attacking the fair market value of the contribution. The Taxpayers filed a petition to challenge the disallowance of this deduction in the Tax Court on June 4, 2004. A trial was conducted on October 24, 2005 and the parties filed post trial briefs, which briefing was concluded in May 2006. As of the filing of this motion almost four (4) years later, the Tax Court has yet to issue a decision in the <u>Rolfs</u> case.

---

[2] <u>Scharf</u> dealt with a 1968 charitable contribution. Since I.R.C. 170(f)(3) was not enacted until 1969, it was not applicable to the analysis in that case. Very importantly, however, since the Scharf decision was not issued until 1973, Section 170(f)(3) was not enacted in response to the case or to the charitable contribution of a structure to a fire department scenario. Rather, as will be explained, its enactment was for another wholly unrelated purpose relating to situations attempting to limit a double tax benefit.

Accordingly, the issue of whether I.R.C. Section 170(f)(3) is applicable to these types of contributions is a case of first impression in the federal courts.  Thus, the Court's determination in this case has far broader implications than just whether the Plaintiffs are entitled to receive a tax refund.  Rather, the Court's determination in this case will very likely  impact the future practice (sanctioned over the last several decades) of citizens donating structures to fire departments that allow first responder fire fighters to receive invaluable live burn training exercises simulated in actual houses located right in the middle of urban neighborhoods.  Thus, the implications of this determination will have a substantial impact on local communities and the training of first responder fire fighters and other law enforcement and safety personnel and will no doubt also have a significant impact on local communities' fiscal budgets.[3]

This practice provides immense value to communities and their fire departments in terms of enabling the fire departments to provide real simulated burn training to their fire personnel without the substantial monetary outlay that would be required to duplicate this type of training for their personnel.  Thus, the reliance on Scharf and the IRS's acquiescence in this practice, which included the comfort that their neighbors or others in the community recently made such a contribution and took a tax deduction with no challenge by the IRS for the last several decades, enabled citizen taxpayers to continue to step up and make these valuable contributions to their communities.

These contributions are usually made in connection with the homeowners' decision to demolish the residence for the purpose of rebuilding a new residence.  However, instead of

---

[3] These challenges by the IRS in attacking these types contributions has already adversely impacted local communities and their fire departments' personnel training.  As explained herein, Captain Lyn Nofziger of the Upper Arlington Fire Department testified that after receiving up to two contributions of residential structures per year over the past twenty years of residential structures to conduct training and fire exercises, as an apparent result of this "tax question," they have only had one contribution of a residential structure since 2005.  Nofziger Dep. 124; 15-23; Dec. 16, 2009.

merely allowing the wrecking ball to demolish the residence, community minded homeowners have investigated the procedures and benefits to community fire departments and have undertaken the extra steps and expense to donate the residence to community fire departments to allow them to conduct various training and burn down exercises on the property.   The extra efforts these homeowners take in contributing their residential structures to fire departments result in immeasurable benefits for the community at large in providing extraordinary training opportunities to their community fire department personnel.

The tax deduction that the Plaintiffs claimed in this case (based upon the appraised fair market value of their residential structure) in the amount of $287,400 is not insubstantial. However, the tax benefits (approximate $100,000 tax savings) that inure to the Plaintiffs and similarly situated taxpayers are incidental and minimal relative to the enormous and immense benefits that flow to the public relating to these contributions.  These types of contributions of residential structures to community fire departments further a legitimate and important governmental function by allowing fire departments and other law enforcement agencies to receive actual training using an actual residential structure situated in their community.  These structures are used and prepared and ultimately burned down in a controlled burn.  This provides actual hands on and real training for the first responder fire personnel rather than obtaining training from far less effective and more costly simulated training means.  Moreover, these types of donations save these communities substantial dollars that they would have otherwise been required to spend in sending their safety personnel to training exercises.   These types of contributions serve a valid and important governmental purpose that should not be frustrated by an erroneous interpretation and application of the Internal Revenue Code to frustrate these types of charitable contributions and safety benefits that inure to the overall community.   Simply

stated, the value of these types of contributions to community fire departments is almost immeasurable.

Because of the IRS's inaction for approximately thirty five (35) years, this practice appeared to be sanctioned and acceptable to the IRS and was based upon well established law. After years of allowing these types of charitable contributions, the IRS is now attempting to change well settled law and deny these deductions and this immense community benefit. The IRS should enact this policy change with sufficient notice and in a prospective manner through the legislative process. This would necessary entail public input and would give taxpayers advance notice and warning of the possible discontinuation of this practice rather than the IRS attempting to stretch the reaches and application of I.R.C. Section 170(f)(3) as being applicable to these types of contributions. As will be shown, this statute is not expressly applicable to these types of contributions. Specifically, neither its legislative history nor even the IRS's interpretation of this statute (in its Treasury Regulations) supports the application of this statute to these types of contributions. This particular statute was not enacted or intended to apply to these contributions. The IRS's resulting strained theories and arguments in attempting to stretch the application of this statute to these contributions are contrary to the principles of statutory construction and basic common sense and fundamental fairness in dealing with the taxpaying public.

Moreover, because of the apparent recognition that the courts might agree that this statute is not applicable, in the middle of these controversies, the IRS has raised an alternative valuation theory to attack these contributions. The IRS's valuation theory proposes that despite the required appraised and documented fair market value of these residential structures at the time of the contributions, certified by an independent and qualified appraiser, that since the structure is

going to be burned down and destroyed, these structures are worth far less than the fair market value assigned to the structure at the time of the contribution.  This valuation theory is contrary to the IRS's own rules and regulations regarding the valuation of a charitable contribution.  Thus, in its attacks in attempting to disallow these types of charitable contributions based upon these theories, the IRS is simply trying to fit the proverbial square peg in the round hole.

If this well settled and IRS sanctioned (for decades) tax policy should be changed, it should be done under the light of day in the legislative process with public input from taxpayers and particularly from representatives of communities and first responder fire departments.  If this were done, taxpayers would have fair notice of this and the law would be applied in a prospective versus a retroactive basis.

Regrettably, the Plaintiffs and similarly situated taxpayers who have made these types of contributions and have recently come under IRS scrutiny related to these contributions have been subjected to publicity related to the incidental tax benefits they received related to these contributions.  In this case, the Hendrixes were motivated to contribute something of real value to the Upper Arlington community.  They sought out and received tax advice from competent tax advisors that they were entitled to a charitable contribution deduction for their contribution.  Based upon this advice and the IRS's previous treatment over the past thirty five (35) years permitting  these charitable contributions, they firmly believed that they strictly followed the law and were entitled to this deduction.   As a result of this controversy and publicity, their contributions have been cast in the public light with the implications that they have done something very aggressive or improper and as if they have intentionally violated the tax laws.

As an example, the Plaintiffs' contribution became the subject of a recent article about this in the Columbus Dispatch.[4]  A copy of this article is appended hereto as <u>Exhibit A</u>.  This article landed on the front page of the Dispatch.  This publicity could be viewed by some that this practice was nothing but an attempted tax dodge available only to seemingly wealthy citizens who could afford to demolish their homes and built another one and that these taxpayers took aggressive and perhaps illegal tax deductions related to these contributions.  On the other hand, other readers could instantly recognize the enormous public benefits related to these types of contributions regardless of any incidental tax benefit received by the donors.  Regardless, all these taxpayers did were to take steps to attempt to benefit the community and relied upon the tax advice they received and the  comforting fact that this practice has been done for decades in the community without any challenge whatsoever from the IRS.

That these taxpayers have been subject to public ridicule is unfortunate.  These citizens who made and make these contributions should not be subjected to any of this unfounded speculation about the validity of their tax deductions related to these contributions.  Rather, these citizens should be personally thanked by every member of their community.  Some communities have public recognition ceremonies related to citizens who make these types of contributions to their communities.  As an example, appended hereto as <u>Exhibit B</u> is a picture of a September 11, 2006 ceremony for home donations made to the Fairfax County Virginia Public Safety agencies.

Unfortunately, as a result of these IRS's attacks on these contributions that started in the Upper Arlington community in 2004, these contributions to the fire department have all but

---

[4] Counsel for the Plaintiffs also initiated a lawsuit on behalf of other Upper Arlington residences in this court relating to the exact same fact scenario for their 2004 contribution of their residential structure to the Upper Arlington Fire Department and claimed charitable contribution deduction which was also disallowed by the IRS. This was case number 2:09-cv-216.  However, because of the similarities  to this case and likely application of the Court's determination in this case to their situation and the enhanced efforts involved in pursuing two cases instead of one, it was determined to dismiss the other case without prejudice.  Regardless of the current procedural posture of that case, the position and arguments in challenging the IRS's position is exactly the same as in this case.

stopped. Thus, the immense and invaluable enhanced training the community's first responders have received at least two times a year for the last two decades has stopped. Instead of making these contributions in the future and risk getting into a costly and public controversy with the IRS, taxpayers will simply let the wrecking ball level the property. This will be extremely detrimental to the training of the first responders and the safety of communities.

II.      **OUTLINE OF RELEVANT FACTS.**

This case involves the tax deductibility of a charitable contribution pursuant to I.R.C. §170. The Plaintiffs contend that there are no material facts in genuine dispute related to their contributing their residential structure to the Fire Department, the Fire Department accepting the property, the Fire Department and other law enforcement agencies using the structure for training and burning exercises, and the Fire Department ultimately burning down the residential structure to the ground. The dispute here is not regarding the underlying facts. Rather, the dispute here centers on the determination of the law to these facts in determining whether upon these facts, the Plaintiffs are entitled to a charitable contribution deduction for the charitable contribution of their residential structure to the Fire Department.

Nevertheless, while the core essential facts are not in dispute, the Plaintiffs believe it is necessary to fully illuminate these facts to present more than a sterile bare bone set of facts to the Court. This is necessary so the Court can gain a full understanding of the precise nature of the contribution, the contract between the parties, the appraisal process and required documentation to evidence the contribution, the tax reporting, and the benefits inuring to the Fire Department.

A.      **The Plaintiffs, their residence, and the decision and process to donate their residential structure to the Upper Arlington Fire Department**.

12

The Plaintiffs, James and Lori Hendrix, are married and have three children.  They have resided in Upper Arlington for approximately fifteen (15) years.  In 1999, the Hendrixes purchased their home at 2480 Sherwin Drive in Upper Arlington for $385,000.  From 1999 until their contribution of their residence to the Upper Arlington Fire Department on June 29, 2004, the Hendrixes resided in this house.  Throughout the approximate five (5) years that the Hendrixes lived in the Sherwin Drive home, they raised their family and enjoyed the property.  The Hendrixes testified that this residence was a perfectly sound structure and a very comfortable home in a very nice neighborhood.  As their family grew, the Hendrixes began contemplating improvements, expansion, and possible additions to the house.  In 2003 to 2004, the Hendrixes were contemplating substantially improving their home and undertook the process of starting to obtain construction bids to determine the costs of these improvements.  Ultimately, through this process, they began to realize that for the total costs and work associated with the extensive improvements they desired, it made sense to explore the costs associated with demolishing their home and rebuilding an entirely new residence on the property.  Thereafter, they obtained bids and construction drawings for building a new residential structure on the property.

During this process, the Hendrixes became aware of other Upper Arlington residents that donated their houses to the Upper Arlington Fire Department for fire training and burn down exercises.  The Hendrixes learned about the value of these types of contributions to the Fire Department and a possible tax deduction related to this contribution.  Mr. Hendrix testified that he became aware of approximately forty contributions to the Upper Arlington Fire Department and that none of those contributors were audited or challenged by the IRS in thirty five years

13

related to a charitable burn.  J. Hendrix Dep. 34:2-8, Dec. 17, 2009.  Accordingly, the Hendrixes decided to look into the procedures and legalities of making such a donation.

Mrs. Hendrix contacted the Fire Department to inquire about the process of donating their residential structure for training and burn down exercises and to determine if their residence qualified for a donation under the Fire Department's guidelines.  Appended hereto as <u>Exhibit C</u> is a copy of documentation from the Fire Department regarding Mrs. Hendrix's initial contact inquiring into this process.  This information includes Mrs. Hendrix's initial contact on May 29, 2002 and a letter to Mrs. Hendrix on May 30, 2002 enclosing an informational packet regarding house donations.  There is also a notation that Fire Department personnel viewed the property on June 6, 2002 with Mrs. Hendrix and answered questions regarding the process.  As part of these notes, it indicates that "isn't ready for at least a year."  Also included in this packet is a document captioned "Procedures for Evaluating an Acquired Structure for use by the Upper Arlington Fire Department."  This document identifies that the Fire Department will begin evaluating the structure's suitability for use explaining that many of the items can be evaluated at an initial site.  There is also a document captioned "House Donation for Fire Training Property Owner Information."  This document outlines the process involved for this donation and the conditions and costs that must be paid for by the homeowner.  Some of these conditions and costs are identified as follows:

> "Building Materials. (Drywall, lumber and hardware to cover all windows and any holes).
> Overtime pay for firefighters the day of the final burn down.  This allows extra personnel to provide fire and EMS coverage to the rest of the city while on-duty personnel participate in the burn.
>
> City Burn Permit ($25.00).
>
> Cost of Demolition Permit.

Cost of providing a Port-a-John.

Removal and disposal of all asbestos containing material.

Removal and disposal of the roof shingles and carpet.

Following completion of the training exercises, the property owner will be responsible for the completion of the demolition process."

Lastly, the packet also contains a detailed six page item by item burn checklist for acquired buildings.  This document identifies all of the steps that must be completed by the homeowner and the Fire Department in connection with this donation and the burn down. Suffice it to say that the Fire Department has accepted numerous contributions of residential structures over the years and has developed a detailed process of qualifying structures and notifying the homeowners of all of the conditions and costs to them of proceeding forward in making a contribution.

It was preliminarily determined that the Hendrixes' residence would qualify for a donation and they became aware of the process and conditions in possibly donating their structure.

**B.      Exploration and Confirmation of Potential Incidental Tax Benefits.**

The Hendrixes became aware that they might be entitled to a charitable contribution deduction on their tax return related to the possible contribution of their residence to the Fire Department.  The Hendrixes were aware that others in the community had donated their residences to the fire department and had claimed charitable contributions on their tax returns. Based upon their conversations with others who had done this, they became aware that all of these individuals claimed tax deductions as a charitable contribution on their tax returns related

to the fair market value of their respective residential structures and that none of these deductions were ever challenged by the IRS.

To confirm the possible tax benefits associated with their possible contribution of their residential structure to the fire department, in early 2004, Mr. Hendrix contacted and retained the large national accounting firm of Deloitte and Touche.  On March 12, 2004, Mr. Hendrix met with personnel from the accounting firm to discuss the tax deductibility of this type of charitable contribution.  Appended hereto as Exhibit D-1 is a copy of the engagement letter with Deloitte. Appended hereto as Exhibit D-2 is a copy of "Discussion Points" outline prepared by Deloitte that was used to go over relevant points in the discussion of the tax deductibility of this type of contribution.  These discussion points were discussed with Mr. Hendrix at the March 12, 2004 meeting with Deloitte.  Appended hereto as Exhibit D-3 are copies of IRS forms and publications that Deloitte presented and reviewed with Mr. Hendrix at this meeting.  Included in these materials is IRS form 8283.  This form was required to be filled in and appended to the Hendrix' 2004 tax return to identify this deduction on their tax return.  Lastly, but importantly, appended hereto as Exhibit D-4 is a copy of the Tax Court case of Scharf v. Commissioner, T.C. Memo 1973-265 (1973) that was given to Mr. Hendrix at the meeting.  That this case was provided to Mr. Hendrix at this meeting with Deloitte is confirmed by the print out date on the bottom of each page of the case that is March 12, 2004.  The Hendrixes paid Deloitte $675 for this consultation.  Exhibit D-5.

As part of the "Discussion Points" outline discussed with Mr. Hendrix at his meeting with Deloitte, the Hendrixes were directed as follows:

"2.    The fair market value of charitable deduction is based on the fair market value of the real property before and after the contribution to the fire department.  If the fire department does not burn down the property, they should

16

do enough structural damage during their drills that the value of the house after the drills is essentially zero.

"7.     The property must be appraised by a qualified independent party prior to the donation.  The appraiser, donor and donee must sign Form 8283. Form 8283 must be attached to the tax return of the donor the year of the transfer."

As a result of this meeting, Mr. Hendrix understood that if he followed the steps related to making and documenting the contribution, they would be entitled to claim this contribution as a charitable contribution deduction on their 2004 federal income tax return.   See January 24, 2008 Affidavit from James and Lori Hendrix appended hereto as <u>Exhibit E</u>.

Additionally, the Hendrixes also had their return preparer and Certified Public Accountant ("CPA"), Mr. David Shealy, research the possible contribution.  Like Deloitte, Mr. Shealy concluded that the Hendrixes would be entitled to claim and deduct a charitable contribution deduction related to this contribution.  See, Letter dated February 22, 2008 from David Shealy, CPA to the IRS appended hereto as <u>Exhibit F</u>.

**C.     <u>Qualified Real Estate Appraisal</u>.**

Prior to the contribution, the Plaintiffs obtained an appraisal of their entire residential property which included both the residential structure and the land.  This appraisal report is dated May 25, 2004 and is appended hereto as <u>Exhibit G</u>.  This report was prepared by an Ohio licensed appraiser named Ann Ciardelli of the R.F. Berger Company.  Ms. Ciardelli appraised the property at $520,000.  Attached to the appraisal report are pictures depicting the property and the residential structure prior to the contribution and burn.  Mr. Hendrix testified that they obtained an appraisal because that is what the procedural information from Deloitte and Touche and their accountant Mr. David Shealy, directed them to do.  Mr. Hendrix testified that they

contacted R.F. Berger Company and that they had no relationship with the company and never worked with the company before. J. Hendrix Dep. 34:20-35: 5.

In terms of determining the charitable contribution deduction, on July 30, 2004, Mr. Hendrix accessed the Franklin County Auditor's website to determine the assessed value of the land itself. The Auditor's appraised value for the land was $232,600. A copy of this July 30, 2004 printout from the Auditor's website is appended hereto as <u>Exhibit H</u>. Mr. Hendrix then deducted the Auditor's website value for the land of $232,600 from the $520,000 appraisal amount to arrive at the charitable contribution deduction of $287,400 to the contribution and burn.

After the controversy began with the IRS, the Hendrixes obtained the second appraisal report from appraiser Ann Ciardelli. This was just a land appraisal report and it was completed on June 5, 2008 with an effective date of the appraisal as of June 11, 2004. A copy of this June 5, 2008 appraisal report is appended hereto as <u>Exhibit I</u>. Again, this appraisal report was for the land only. This appraisal report appraised the land as of June 11, 2004 as having a value of $230,000. Thus, these two reports together valued the residential structure itself at $290,000. Importantly, during the pendency of this controversy with the IRS, the IRS was provided with both Ann Ciardelli's and R.F. Berger's background and qualifications.

> **D.**      <u>**The Burn Contract and Charitable Contribution.**</u>

After meeting with Deloitte & Touche and Mr. Shealy and obtaining confirmation that this contribution was tax deductible, the Hendrixes decided to move forward and contribute their home to the Upper Arlington Fire Department. Upon making this determination, the Hendrixes began firming up their plans to donate their residential structure to the Fire Department and the City of Upper Arlington. The Hendrixes met with the City to discuss the contribution.

Upon meeting with the City of Upper Arlington and the Fire Department to discuss this potential contribution, the Hendrixes firmly decided to make the donation.  On June 29, 2004, the Hendrixes entered into a contract (hereinafter referred to as the "Burn Contract") with the Upper Arlington Fire Department related to their contributing their residential structure to the Fire Department for training and burn exercises.  A copy of this contract is appended hereto as Exhibit J.  This form contract specified that the Hendrixes granted the Fire Division of the City of Upper Arlington, Ohio the use of the property and structures for the purposes of Fire Division training.  The contract expressly stated the following:

> "The structure is to be burned and/or demolished as seen fit by the Fire Division for said training.  The property owner(s) acknowledge that once the training exercise begins and during the exercise that the property owner(s) has no authority to direct or control Fire Division actions in this matter.  The property owner(s) acknowledges that the structure may be partially damaged or fully destroyed by burning or other means prior to its release to the owner(s) following the training.

> Property owner(s), at owner(s) expense, shall level any building and fill any excavation promptly after the training exercise is complete.  Property owner(s) shall complete leveling and filling of any excavation within seven (7) days of the completion of the exercise.

> The City of Upper Arlington does not express any opinion regarding the tax consequences of this transaction.  Property owner(s) was advised to consult with his/her tax adviser regarding the availability of and requirements for taking any tax deduction.  Upon request, the City of Upper Arlington will provide written acknowledgement that the structure was partially or fully destroyed as a result of the fire training exercises."

Importantly, as set forth above, the Hendrixes acknowledged in this agreement that once the training exercises began and during the exercise that they had no authority to direct or control the Fire Division with regards to the treatment of the property.  Additionally, the agreement also provided that the Hendrixes were responsible for leveling and excavation and filling in the property within seven (7) days after completion of the exercise.

This agreement was signed by the Hendrixes, Mitch Ross, the Fire Chief, two training officers from the City of Upper Arlington's Fire Department, and Upper Arlington's City Attorney on June 29, 2004.  All signatures were notarized by a Notary Public.

On June 29, 2004, the Hendrixes turned over the property to the complete control of the Fire Department.  From June 29, 2004 until the property was burned down on October 29, 2004, the Fire Department had exclusive use and control over the property.  During this time, the Fire Department and other law enforcement personnel used the property for various training exercises.

E.      **The Fire Department and other law enforcement agencies' utilization of the donated residential structure.**

Captain Lyn Nofziger testified that they took over the property on June 29, 2004 until the date of the burn on October 29, 2004.  Nofziger Dep. 34:4 - 35:2.  Upon taking control of the residential structure, the Fire Department began doing its fire training exercise.  Captain Nofziger testified that once the property was turned over to the Fire Department on June 29, 2004, that it was the Fire Department's responsibility to maintain and secure the property. Nofziger Dep. 111:8-16.

According to Captain Nofziger, in 2004, the Upper Arlington Fire Department had 61 uniform firefighters, including paramedics.  Nofziger Dep. 95:15-20.  Captain Nofziger indicated that barring vacations and those types of things, he estimated that all 61 firefighters, including the Fire Chief, participated in the training activities at the Hendrix residence at one time or another.  Nofziger Dep. 96:4-17.  He testified that perhaps a third of the department would have trained in the actual burn date.  Id.  Captain Nofziger testified that the department feels comfortable doing two (2) of these types of burns a year if donations are available.  Nofziger

Dep. 96:18-23.  He indicated that they could possibly do three (3) but that would be pushing it.
Id.

      With regard to documenting the burn downs, Captain Nofziger identified a document that describes all of the structures from 1988 through 2005 that have been donated to the Fire Division for training purposes where they have either burned down the house or made it uninhabitable and demolished.  A copy of this listing is appended hereto as Exhibit K.  He testified that this document was prepared and maintained by the Fire Department.  He testified that the Fire Departments had one burn down in 2006 and that was the only burn down that the Fire Department has had since October 2005.  Nofziger Dep. 100:20-101: 3.  He believes that since the whole tax question has come up, that these donations have dried up.  Nofziger Dep. 101: 6-14.

      Captain Nofziger also provided information on how an offer to make a donation of a residential structure was handled by the Fire Department.  Specifically, Captain Nofziger testified that they would periodically get calls from City of Upper Arlington residents inquiring into whether they can donate their homes to the Fire Department.  Nofziger Dep. 14:4-15:2.  Upon receiving a call, the Fire Department would look at the Auditor's website to determine if the property was on a busy street, if it was in a historical district, and other type of logistical things to determine if it would qualify for a donation.  Id.  Captain Nofziger testified that the Fire Department would not accept all requested donations.  Nofziger Dep. 97:23-98:4.  He indicated that some of these residents are turned down for reasons that the electrical lines are too close to the structure, or houses surrounding the structure are too close, or the street might be busy.  Nofziger Dep. 98:7-16.

If the property qualified for possible donation, Captain Nofziger testified that they would re-contact the homeowner and send them a sample packet describing the procedures and costs of moving forward with the donation.  Nofziger Dep. 15:22-16:2.  A copy of the sample packet is appended hereto as Exhibit C.  They would then meet at the residence and do a walk through of the structure to make sure everything was acceptable to Fire Division.  Nofziger Dep. 14:12-21. He testified that the Fire Department spends time evaluating the structure before accepting a donation because the Fire Department wants to ensure that they can utilize the property and get the most out of the training.

Captain Nofziger testified that the Fire Department in accepting structural contributions and conducting fire and burn down exercises on the premises must abide by National Fire Protection Association ("NFPA") 1403 guidelines, which are guidelines for donated structures, acquired structures, and that these other guidelines that they have to follow as a fire division. These guidelines dictate what is spelled out in the sample packet.  Importantly, there are a lot of residents' responsibilities related to the contribution such as their responsibility for removing the shingles, removing the carpet, utility shutoff, asbestos testing and removal, and the demolition and excavation costs once the burn is complete.  These are costs paid by the homeowner in connection with the contribution.  Nofziger Dep. 19:20-20:4.  Captain Nofziger testified that the Fire Department walks through the premises beforehand to make sure that it meets their training needs.  Nofziger Dep. 20:5-12.  He pointed out that they would not accept the structure unless it was structurally sound.  Nofziger Dep. 20:17-22.

Captain Nofziger testified that the Fire Department likes to use the site for a minimum of 45 days because it takes that long to get the house structure prepped for the burn, but they have done 90 to 120 days.  Nofziger Dep. 21:3-12.  However, they like to use the structure as much as

possible to get the benefits of training.  Id.  In the Hendrixes' case, they had control over the property from June 29, 2004 through October 29, 2004.

With regard to Hendrix contribution and burn down, Captain Nofziger indicated that he was in charge of that and in connection therewith, he prepared a six page pre-burn checklist for acquired buildings, a copy of which is appended hereto as Exhibit L.  Nofziger Dep. 56:17-57:11.  Captain Nofziger explained that the burn checklist goes through all of the items that need to be covered in preparation for training exercises and the burn.  The burn checklist identifies all of the things that the homeowners must do, at their own expense, like removing the carpet and the shingles and other items like that that are identified on the burn contract.  Nofziger Dep. 62:19-63:17.  This six page document outlines all of the action steps that must be completed for a burn and shows the date each of these were completed related to the Hendrix burn.  In addition, Captain Nofziger had to make application to the Ohio EPA regarding their notification of intent to conduct open burning on the property.  A copy of this notification application is appended hereto as Exhibit M.  Thus, there are very rigorous guidelines that must be followed and complied with by the Fire Department in these burn down transactions.

In addition to the burn exercises, Captain Nofziger prepared a memo to the Chief outlining the training that occurred at the Hendrixes' residence after the donation to the Fire Department.  A copy of this memo is appended hereto as Exhibit N.  As explained by Captain Nofziger, in the course of training on the property, the Fire Department performed a cardiac arrest scenario on the roof, domestic violence scenario for WBNS 10 TV, various company drills, which would entail opening the structure up to the fire of the individual fire companies.  Nofziger Dep. 32:7-16.  They also did fire behavior testing with the State Fire Marshal's Office, Firefighter for a Day, which allowed different employees of the City of Upper Arlington to

become firefighters for the day.  The Fire Department was also able to do hose line evolutions through the structure, bring automobiles on the property for auto extrication, and other various training exercises.  Nofziger Dep. 32:17-33-3.  Captain Nofziger indicated that they then did a lot of training scenarios on the burn down date which was October 29, 2004.  Nofziger Dep. 33:2-3. Fortunately, Captain Nofziger indicated there were no injuries related to this burn down, but that he is aware that other fire services have had deaths in these types of training exercises.  Nofziger Dep. 33:14-34:3.

The Upper Arlington Fire Department reserved the last day for the burn down.  Captain Nofziger outlined all of the live burn training scenarios in a report he prepared captioned "2580 Sherwin Rd. Live Burn Training," a copy of which is appended hereto as Exhibit O.  He testified at the beginning of the day that they would do some live burn training scenarios such as in and out training whereby they would set a room on fire, put it out, excavate the smoke, and maybe go in, rescue some mannequins and maybe do some roof operations, cutting out a roof, those types of things.  Nofziger Dep. 42:9-17.  Then, towards the end of the day, they would do the final burn whereby they would let the fire go and they would strategically start letting it burn slowly from one side of the house to the other.  Nofziger Dep. 42:18-22.

Chief Mitch Ross of the Upper Arlington Fire Department also provided deposition testimony regarding the specific training on the Hendrix residential structure.  Specifically, Chief Ross testified that the Department did the following exercises:

> "We did cardiac arrest training on the roof, which would have involved not only the EMS skills, but the reason we do it on the roof is to do some of the rescue skills and those types of things, you know, things that wouldn't normally be able to just train on them in our classrooms.  It looks like we did a domestic violence scenario for WBNS 10TV.  The companies – a lot of times when I talk about companies, I'm talking about individual fire apparatus and their crews.  Well, we typically, if we can, we will set the building aside for a week or two weeks or whatever for them to be able to go down, and, you know, the company, Officer

24

knows, hey, my guys may need this, you know, a little brush up on this certain skill set. I have noticed that we hadn't been in a fire that, you know, we've had to do a search on or whatever, so they'll go in and they'll kind of design their own training or they'll just –

And there may be some types of things in a certain structure that they'll want to do some training on. So we set aside drills for company – what we call company drills. In this case, the State Fire Marshal came out and did some fire behavior testing. Sometimes what that is if they've had – the Arson Bureau or whatever has had some fires, we will try to recreate as close as we can so they can kind of see these in the structure and things like that. In this case, we did a Firefighter for a Day for other city employees, which is a training session and let's them know what our job is. And we do that basically back and forth across lines so we kind of know what – we don't expect anybody to do our job, but it makes us work a little better as a city. And, obviously, the live fire training.

Also, in this case, I see where the Upper Arlington Police Department did some training. And sometimes we will train together with the Police Department. Sometimes, they will have their own separate – they'll call in other people and all of that, and that obviously State Fire Marshals will …"

Ross Dep. 15:8-17:4, Dec. 17, 2009.

After the burn, Captain Nofziger indicated that there was nothing salvageable from the house with the exception of maybe some bricks or stone, but that everything was pretty much demolished in the burn. Nofziger Dep. 64:11-19. Appended hereto as Exhibits P-1 through P-8 are some selected pictures taken during the day that the residential structure was burned down to the ground. These pictures were taken by the Fire Department and maintained in the Fire Department's records and documentation of the Hendrixes' residential structure burn down. These pictures illustrate some of the Fire Department personnel in training in containing the fire. These pictures show that the extent of the fire and that the entire structure was burned down to the ground. A disc containing all of these pictures from the day of the fire was also filed with the court in connection with this motion so the Court could view the full nature and extent of this fire and exercises and in color.

After the October 29, 2004 burn, the Fire Department turned back over access to the land to the Hendrixes.  This is documented in a document appended hereto as <u>Exhibit Q</u>. Additionally, by letter dated November 16, 2004, the Fire Department thanked the Hendrixes for their contribution and sent them an invoice totaling $4,594.64 for items such as overtime on the day of the burn and other items the Hendrixes were responsible for paying.  A copy of this letter is appended hereto as <u>Exhibit R</u>.  The Hendrixes paid all of these expenses as is shown by copies of their checks appended hereto as <u>Exhibit S</u>.  Finally, by letter dated January 12, 2005 from the Upper Arlington's City Attorney's office, a copy of which is appended hereto as <u>Exhibit T</u>, the City sent to the IRS a completed Form 8282, Donee Information Return.  This letter and form notified the IRS that the Hendrixes donated a residential structure for fire training exercises and attached a copy of the June 29, 2004 Burn Contract.  Thus, not only did the Hendrixes notify the IRS of the specific type and nature of their 2004 charitable contribution when claiming this deduction on their personal income tax return, the IRS also had notice of the specific contribution from the City donee when it filed this form and information with the IRS.

**F.**     **<u>The Immense and Almost Immeasurable Training Benefits that Inure to the Fire Department as a Result of Hendrixes' Contribution</u>.**

When asked about the value of a residential contribution to the Fire Department for burn exercises, Captain Nofziger stated the following:

> "It is a great value to us as a Fire Division and as – also, I'll speak for the Police Department a little bit, because they've said how valuable the training has been for them.  But fires have decreased across the nation, and so you don't get as many structural fires.  We go through fire training – a cadet may go through fire training – an example for me, I went through fire training in 1984, 1985, that time frame, and, you know, I could maybe not see a – what we call a working structure fire for years, especially in a community like Upper Arlington, things like that.
>
> So having the value to be able to go in and train with live fire is extremely valuable.  When you are a cadet, a lot of times you don't have the ability to train

26

in an acquired structure or actual residence.  You are using a concrete block burned building.  That reacts differently than a structure, a wooden structure with drywall and things like that.  But being able to show the firefighters the conditions that can occur within 30 seconds, the changing conditions that can occur, the flashover can occur, and if you're in the wrong place at the wrong time, it will kill you just about instantly.  It will bring temperatures up to 1500 to 2000 degrees. And if you're there, you will not survive that.

So the value of the training is just overwhelming, and that's why we felt – every time we've gotten a structure, we felt lucky to have it, and we try to use it the best we can to our ability, limiting what else we have going on within the Fire Division, you know, other things that may be going on that may limit us to be able to go out and use this structure.  But to the best of our ability, we'll go out and use this structure to help train our firefighters."

Nofziger Dep. 46:16-48:13.

In Captain Nofziger's testimony, on page 114 of his deposition transcript, he outlined the value of these types of donated structures to the Fire Division.  In his testimony, he contrasted the great value to the Fire Department versus having to send personnel to the Training Academy and the value that the department gets of actually working as a team under the supervision of the supervisors who are actually responsible for this at the Fire Department.  Nofziger Dep. 114:8-115:4.

Chief Ross testified about the value of the donated structures to the City of Upper Arlington for burn exercises.  In this regard, he testified as follows:

"Yes.  I mean, in my opinion, it's very valuable training.  We, Upper Arlington, does not have a burn structure.  We don't have – I mean, even really within our city limits – any place, I think, that would be appropriate for us to have a training facility of that nature.  There is a huge value, I believe, in training and structures that we are actually – similar to those that we are actually going to be working in at any given time.

There is, you know, the fact that we can train in structures within Upper Arlington means that we are able to take our companies in tact with, you know, the guys that train together – or that work together as a team will also be able to train together, which is something if we were to go outside of our city limits to, say, the Fire Academy or whatever, it becomes problematic budgetary-wise, and everything wise, to be able to try and keep that crew, you know, to send them out there.  Or

27

because of operationally, if we are going to do that while they're on duty, we have to have somebody paid in on overtime or whatever to continue and maintain our services in the city."

Ross Dep. 41:18-42:18.

Finally, with regard to training at a Fire Training Academy versus on an actual residential

structures, Chief Ross stated as follows:

"No, not the same types of training.  No.  I mean, there are burns – there are structures that are built specifically to do burning in.  They typically are either steel or concrete buildings – used to be used wood.  I think they still do use wood pallets or straw or whatever those structures.  Some of those now have gone over to natural gas and are computer programmed and all of that.  My feeling is on those, they are very good structures to use to teach basic skills, but they don't behave like a house fire would behave because they're not wood and drywall and you know, things that – they are designed to repeatedly burn it over and over and over, whereas when you burn in an actual structure, a house, it will typically behave like a fire would in that house and any house similar to that if we were to approach it when we're not in training, when it's an actual fire."

Ross Dep. 42:23-43:18.

Finally, in commenting on the impact of the fire training if no more structures are

donated, Mitch Ross indicated the following:

"I think it's going to impact it a lot, and that it will make it very difficult for us to have the skill level that we – that I feel like we need to provide our citizens.  Because as I said, I mean, we're – we don't have a large amount of fires in the City of Upper Arlington, which is a good thing.  But it also – and I hesitate to say that in any way, it's a bad thing, but we are still expected to perform when we do have a fire, and if we're not gaining that experience on a day-to-day basis fighting fires, there has got to be a way for us to do that.  And donated structures, while difficult and time consuming for us to do that, it has been my opinion that it is very worthwhile to do that to keep our guys' skills up."

Ross Dep. 45:13-46:4.


**G.      The Hendrixes' 2004 Tax Reporting and Claiming Charitable Contribution Deduction.**

28

On or about October 15, 2005, the Plaintiffs filed their 2004 joint IRS Form 1040, U.S. Individual Income Tax Return.  This return reported their charitable contribution deduction of $287,400 based upon their contribution of their residential structure to the City of Upper Arlington Fire Department.  The Plaintiffs properly provided all of the necessary substantiation for the charitable contribution deduction.  Specifically, the Hendrixes' accountant and return preparer identified and instructed them to complete and attach all required forms and information, including IRS Form 8283 and a certification of the value of the deduction by a licensed appraiser.  This form was signed by the appraiser and on behalf of the City of Upper Arlington as donee.  There is also an attachment to the Form 8283 which is an acknowledgement from the City of Upper Arlington that the residential structure was donated for fire training exercises.  A copy of IRS Form 8283 that was appended to the Hendrixes 2004 federal income tax return is appended hereto as Exhibit U.

### H.    The IRS Audit and IRS Position in Disallowance of the Charitable Contribution Deduction.

The IRS audited the Hendrixes' 2004 federal income tax return and disallowed the charitable deduction on the basis that the contributed residential structure did not constitute the taxpayers' entire interest in their property.

On April 10, 2008, the Plaintiffs paid the IRS $125,052.85.  This amount represented the additional tax liability of $100,590 and interest accrued to that date of $24,462.85.  On or about July 25, 2008, the Plaintiffs filed a Claim for Refund with the IRS for the refund of taxes erroneously collected by the IRS.

### LAW AND ANALYSIS

### I.    STANDARD FOR SUMMARY JUDGMENT.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered where the pleadings, depositions, answers to interrogatories, affidavits, and other documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The United States Supreme Court has stated that:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of [the Rules of Civil Procedure] as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.

Celotex v. Catratt, 477 U.S. 317, 327 (1986).

Although a party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, a non-moving party, who bears the burden of proof on a particular issue, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); and Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 585-586 (1986).  The non-moving party must produce more than a scintilla of evidence to overcome a summary judgment motion.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989) (referencing Liberty Lobby, Celotex and Matsushita).  It is not sufficient for the non-moving party to merely "show that there is some metaphysical doubt as to the material facts."  Street (quoting Matsushita, 475 U.S. at 586).  The non-moving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## IV. THIS CHARITABLE CONTRIBUTION DEDUCTION IS ALLOWED UNDER I.R.C. SECTION 170 AS INTERPRETED BY SCHARF V. COMMISSIONER.

### A. I.R.C. Section 170(a)(1).

I.R.C. §170(a)(1) provides that there shall be allowed as a deduction any charitable contribution made within the taxable year.  I.R.C. §170(c) defines the term "charitable contribution" to mean a contribution or gift to or for the use of a state, possession of the United States, any political subdivision if any of the foregoing, or the United States or the District of Columbia, but only if the contribution is made for exclusively public purposes.  There can be no dispute that the gift of the residential structure to the Fire Department of the City of Upper Arlington, Ohio qualifies under this definition.  The property was used by the political subdivision for the community good in fire and other law enforcement training exercises.

**B.     <u>Scharf v. Commissioner, T.C. Memo 1973-265 (1973).</u>**

In claiming a charitable contribution tax deduction for contributions of residential structures to community fire departments for fire and burn down exercises, taxpayers relied upon well settled law outlined in the United States Tax Court's decision in <u>Scharf v. Comm'r</u>, T.C. Memo 1973-265 (1973).  In <u>Scharf</u>, the Tax Court squarely held that a charitable contribution of a residential structure to a local fire department for burn exercises qualified as a charitable contribution under I.R.C. Section 170.  Importantly, the subsequently enacted I.R.C. Section 170(f)(3) (<u>Scharf</u> dealt with a 1968 burn down) did <u>not</u> overrule the specific holding in <u>Scharf</u> and does not overrule the IRS's subsequent Action on Decision in which the IRS acquiesced to the holding of <u>Scharf</u>.  Moreover, as will be discussed below, Section 170(f)(3) was not enacted to address a donation of an entire residential structure like that in <u>Scharf</u> (and the instant case) where the taxpayer donated all of his rights, interests, dominion and control in the structure to the fire department.  That type of donation was done with the intent and contemplation that the property would be completely destroyed by the fire department.

Scharf involved a taxpayer's charitable contribution of a fire damaged building to a local fire department for the purposes of fire training in tax year 1968. Scharf, T.C. Memo 1973-265 at *5. The IRS challenged the deduction and argued that the taxpayer was not entitled to a charitable contribution deduction because the taxpayer had a desire to rebuild the building, and therefore his donation of the building was with the expectation that its demolition would increase the value of the land and make the property easier to convert to a more productive use. Id. at *14-15. Accordingly, the IRS argued that the taxpayer's donation was not motivated by a detached and disinterested generosity, but was rather to obtain a direct or indirect benefit by enhancing the value of his remaining property. Id. at *15. Additionally, the IRS argued that the taxpayer made this contribution with the expectation that he would receive something in return as quid pro quo for the transfer. Id. at *15-16. The IRS argued that it was clear that quid pro quo did flow back to the taxpayer in that he did not have to demolish the building. Id. at *16.

The Tax Court held that the taxpayer's benefit was far less than the greater benefit flowing to the volunteer fire department's training and equipment testing operations. Id. at *20. The Tax Court held that the taxpayer benefited only incidentally from the demolition of the building and that the community was primarily benefited in its fire control and prevention operations. Id. Based upon this analysis, the Tax Court held that the petitioner was entitled to a charitable contribution deduction. Id.

     **C.**      **IRS's Acquiescence of the Scharf Decision.**

Subsequent to this Tax Court opinion, the IRS acquiesced to the holding in the Scharf case. See, AOD LEXIS 17, March 20, 1974, copy appended hereto as Exhibit V. As is made clear in the Action on Decision, IRS counsel accurately stated that the Tax Court in Scharf found as a fact that the benefits flowing back to the petitioners, consisting of clear land, were far less

the greater benefit flowing to the Fire Department and that the petitioners benefitted only incidentally.  Further, with regard to the argument about the use of the building, counsel stated that "in effect, the court held that under the circumstances of this case, donation of the right to destroy a building is the same as donation of the building itself.  Such finding is correct."

Moreover, counsel asserted the following:

"Respondent argued that, for donation of property to qualify as a charitable contribution, it must stem from "detached and disinterested generosity," citing Commissioner v. Duberstein, 368 U.S. 278, 80 S. Ct. 1190, 4 L Ed. 2d 1218 (1960).  Notwithstanding that the court in dicta appeared to approve this position, the Service will no longer make this argument.  (Citations omitted)."

Accordingly, prior to the IRS's attempts to apply I.R.C. §170(f)(3) to these types of contributions, taxpayers relied upon Scharf for its clear holding that charitable contributions of a building and/or other property structures to a volunteer fire department constituted a valid charitable contribution for purposes of the charitable contribution deduction I.R.C. §170.  Scharf is the controlling law here related to these types of charitable contributions and it squarely supports a charitable contribution deduction for the contribution of a residential structure to a community fire department for training and burn down exercises.  As will be explained below, Section 170(f)(3) was not enacted to apply to this type of contribution where all the rights, interests, dominion and control and all indicia of ownership related to the residential structure is given to the fire department.

### D.     Rolfs v. Commissioner, Tax Court Docket No. 9377-04.

Counsel has conducted an exhaustive search of all possible relevant legal decisions since the Tax Court's 1973 Scharf decision.  Counsel has located only one other case related to the issue that was decided by the Tax Court in Scharf of whether a contribution of a structure to a community fire department constitutes a deductible charitable contribution.  One reason for this

void is that the Tax Court decided this issue in 1973 and this precedent is clear and unambiguous and supports the claiming of a charitable contribution for this type of contribution.

This yet undecided case is the Tax Court case of <u>Rolfs v. Commissioner</u>, Tax Court Docket No. 9377-04.  This case involves taxpayers who in 1998 contributed a house to a Fire Department for purposes of fire training exercises and claimed a charitable contribution deduction for the value of the structure on their 1998 federal income tax return.  The IRS disallowed the taxpayers' charitable contribution deduction based upon three alternative theories. The Rolfs filed a petition to challenge the disallowance of this deduction in the Tax Court on June 4, 2004.  A trial was conducted on October 24, 2005 and the parties filed post trial briefs which briefing was concluded in May 2006.  As of the filing of this motion almost four (4) years later, the Court has yet to issue a decision in the case.  A copy of the Tax Court's docket sheet in the <u>Rolfs</u> case is appended hereto as <u>Exhibit W</u>.

In most respects, the facts and legal issues presented in the <u>Rolfs</u> case are similar to the facts and legal issues presented in this case.  In <u>Rolfs</u>, the taxpayer petitioners ("Petitioners") donated a home located in the Village of Chenequa, Wisconsin on February 10, 1998 to the Chenequa Fire Department.  The Petitioners had purchased this property on November 27, 1996. The property included a house, a detached garage, a boathouse, a well and a septic system.  As of the purchase date, the Petitioners had a fee simple interest in all of the improvements, as well as the land.  The Petitioners only donated the residential house located on the property to the Fire Department.  Prior to the charitable contribution the Petitioners rented this house.

Unlike in the instant case, Mr. Rolfs and the fire department did <u>not</u> enter into any contract for the contribution of this house.  Rather, Mr. Rolfs only communicated with the fire department both orally and by written correspondence of his desire to donate the house to the

Fire Department.  Specifically, Mr. Rolfs sent a letter to the fire department expressing his intentions with respect to the contribution.

From February 10, 1998 through February 21, 1998, a period of eleven (11) days, the fire department used the house for various training and fire fighting exercises.  Upon the fire department's completion of these exercises, the house was completely demolished.  Subsequent to the fire department's use of the house, the Rolfs rebuilt another house and subsequently sold it to the their mother-in-law for $1.01M.

On the Petitioners' 1998 federal income tax return, the Petitioners claimed a charitable contribution deduction of $76,000.  In relation to this charitable contribution deduction, the Petitioners attached the requisite qualified appraisal and forms.  Accordingly, the Taxpayers satisfied all documentation and filing requirements with respect to the charitable contribution.

The qualified appraisal upon which the Taxpayers relied based the valuation of the donated property on a contributory value analysis.  Specifically, the qualified appraisal determined the fair market value of the contributed structure by valuing the entire property which included the donated structure using a direct sales comparison approach in determining a fair market value of $675,000.  The appraiser then deducted the contributory value of the land and buildings other than the structure at $599,000.  Accordingly, the qualified appraisal arrived at a contributive value of the structure for $76,000.  The appraisal found that the replacement value of the structure was $316,850.

As will be more fully discussed below, the IRS asserted most of the same theories in the Rolfs case as are being asserted in this case.  It is anticipated that these same arguments/theories will be raised again in this case.  Therefore the Plaintiffs will analyze each of these here to show their non-applicability to this type of charitable contribution.

35

V.     **INTERPRETATION AND APPLICATION OF I.R.C. SECTION 170(f)(3)  ---
       THE PARTIAL INTEREST ISSUE**

The primary issue raised by the Government here (and in the <u>Rolfs</u> case) to support its

erroneous disallowance of the Hendrixes' charitable contribution is that I.R.C. §170(f)(3)

prohibits such a contribution because the Taxpayers only contributed a "partial interest" in their

property or because they only allowed the Fire Department to "use" the property.

I.R.C. Section 170(f)(3) provides as follows:

> (3)     Denial of deduction in case of certain contributions of partial interests in
> property.
>
> (A)     In general. In the case of a contribution (not made by a transfer in
> trust) of an interest in property which consists of less than the taxpayer's entire
> interest in such property, a deduction shall be allowed under this section only to
> the extent that the value of the interest contributed would be allowable as a
> deduction under this section if such interest had been transferred in trust.  For
> purposes of this subparagraph, a contribution by a taxpayer of the right to use
> property shall be treated as a contribution of less than the taxpayer's entire
> interest in such property.
>
> (B)     Exceptions.  Subparagraph (A) shall not apply to –
>
> (i)     a contribution of a remainder interest in a personal
> residence or farm,
>
> (ii)     a contribution of an undivided portion of the taxpayer's
> entire interest in property, and
>
> (iii)     a qualified conservation contribution.

I.R.C. §170(f)(3).

The Hendrixes contend that the Government's position regarding the application of I.R.C.

Section 170(f)(3) to this contribution is erroneous because (1) the provisions of I.R.C. §170(f)(3)

were not intended to apply to contributions of residential structures; and (2) the Hendrixes made

a contribution of their <u>entire</u> interest of their residential structure and they did <u>not</u> simply grant

the Fire Department the "use" of their residence.  The contribution of the residential structure constituted the Taxpayers' entire interest in the residential structure.  As a condition of the contribution, the Taxpayers were required to abandon the residence and they were also required to turn over access and control of the entire residential structure to the Upper Arlington Fire Department.  They turned over the property on June 29, 2004 and did not get the right to go back on the property until after October 29, 2004 after the structure was burnt down to the ground and completely destroyed.  Thus, I.R.C. §170(f)(3) is not applicable to the facts of this case and it is certainly not expressly applicable pursuant to its terms or the terms of the underlying regulations.

Furthermore, the legislative history of this provision, which was enacted in 1969 and made effective to apply to gifts made after July 31, 1969, does not support the IRS's attempted interpretation and the application of this code section.  Specifically, the legislative history of I.R.C. §170(f)(3) clearly identifies the intended contributions for the partial interest and use provisions to apply.  Regardless, even if this Court were to find that I.R.C. §170(f)(3) was applicable to these types of contributions, the Hendrixes  contributed their <u>entire</u> interest in the residential structure to the Fire Department and they did not merely grant the Fire Department the use of the property.

### A.     The Partial Interest Provisions of I.R.C. §170(f)(3) Do Not Apply to Hendrixes' Contribution.

The IRS and federal courts have long recognized the importance of legislative history and the legislators' purpose in implementing a taxing statute.  Specifically, courts have often interpreted the application of a statute based upon the stated legislative intent of the legislators.

The Sixth Circuit has stated that "[i]t is a well-established rule of statutory construction that we must first look to the plain language of the statute to determine its meaning.  <u>Bradley v. Austin</u>, 841 F.2d 1288 (6th Cir. 1988); <u>McBarron v. S & T Industries, Inc.,</u> 771 F.2d 94 (6th Cir.

1985); <u>D.J. Lee, M.D., Inc. v. Commissioner</u>, 931 F.2d 418, 420 (6th Cir. 1991).  Similarly, the

Sixth Circuit has stated that "in determining the meaning of legislation, we must look to the plain

language of the statute itself.  If we find that the statutory language is unambiguous, then that

language is regarded as conclusive unless there is a clearly expressed legislative intent to the

contrary.  If we find that the statute is ambiguous, we then look to its legislative history."

<u>Bradley v. Austin</u>, 841 F.2d 1288, 1293 (6th Cir. 1988); <u>In re Lucas</u>, 924 F.2d 597, 601 (6th Cir.

1991).  The use of legislative history and purpose has been especially important when deciding

the application and purpose of a statute when it is not clear from the face of the statute how it is

to be applied.  Accordingly, the legislative history and purpose of I.R.C. §170(f)(3) is essential in

determining whether this provision is applicable to the Taxpayers.  The issue here is whether this

provision applies to charitable contributions such as the Hendrixes.

     With regard to the cannons of statutory construction applicable to tax statutes and

specifically those that relate to charitable deductions, the Sixth Circuit stated the following in

<u>Weingarden v. Commissioner</u>, 825 F.2d 1027 (6th Cir. 1987):

> "The general canon of construction is that statutes imposing a tax are interpreted liberally
> (in favor of the taxpayer).  See <u>Porter v. Comm'r</u>, 288 U.S. 436, 442, 77 L.Ed. 880, 53 S.
> Ct. 451 (1933); 1 R. Mertens, Law of Federal Taxation Section 305 (1986).  But
> provisions granting a deduction or exemption are matters of legislative "grace" and are
> construed strictly (in favor of the government).  See 1 R. Mertens, supra, at Section 3.07.
> A special rule applies to charitable deductions, however, because these provisions are an
> expression of "public policy" rather than legislative grace.  See, <u>Helvering v. Bliss</u>, 293
> U.S. 144, 150-51, 79 L.Ed. 246, 55 S. Ct. 17 (1934); <u>Hartwick College v. United States</u>,
> 801 F.2d 608, 65 (2d Cir. 1986).  Provisions regarding charitable deductions should
> therefore be liberally construed in favor of the taxpayer.  See, <u>Hartwick College</u>, 801 F.2d
> 615."

Section 170(f)(3) was enacted in 1969 as part of the Tax Reform Act.  The Joint

Committee Report of Public Law 91-172; 91st Congress; HR 13270; JCS-16-70 provides that this

section was enacted to preclude taxpayers from obtaining what was described as a "<u>double tax</u>

benefit" where charities are given the right to use property for a given period of time and the taxpayers took both a charitable contribution deduction and also do not have to claim rent on the premises for the income they otherwise would have earned from the premises.  *See*, Stark v. Commissioner, 86 T.C. 243 (1986); Peters v. Commissioner, TC Memo 1976-170.  The Joint Committee Report explains this provision by providing that a charitable contribution is not to be allowed for contributions to a charity of less than the taxpayer's entire interest in the property, except to the extent a deduction would have been allowed had the interest been transferred in trust.  Id.  Accordingly, most of the legislative history concerning income tax deduction for gifts of partial interests focused on the practice of taking a deduction for the donation of the rent free use of property for a specified time.

As provided for in General Counsel Memorandum 39729 (1988), the IRS inferred another purpose of I.R.C. §170(f)(3) by comparison to the corresponding gift and estate tax provisions regarding gifts and partial interests.  Specifically, the IRS argued that the second purpose of I.R.C. §170(f)(3) was to provide a closer correlation between the amount of the charitable contribution deduction and the actual value of the benefit received by the charity.  Id. at *9, *see also*, HR Rep. No. 91-413, *supra*, at 61, 1969-3 CV at 239; S. Rep. No. 552, 91st Congress, 1st Session 87, 93 (1969).  The Tax Reform Act of 1969, Pub.L. No. 910172, 83 Stat. 487, not only included rules prohibiting a deduction for partial interest charitable contributions, it also provided rules governing charitable gifts of partial interests in several other contexts; income tax deductions for gifts in trust, estate tax deductions (I.R.C. §2055(c)(2)), and gift tax deductions (I.R.C. §2522(c)(2)).

Based upon the foregoing, the stated and most compelling legislative purpose of I.R.C. §170(f)(3) is to avoid a double tax benefit by preventing taxpayers from contributing only a floor

of their building to a charity and taking a charitable contribution deduction for the cost of renting

said floor while also not reporting this cost as income.   This legislative purpose is also

illuminated in the IRS's Treasury Regulations under I.R.C. Section 170, wherein there is an

example of the application I.R.C. §170(f)(3).  Specifically, Treas. Reg. §1.170A-7(d) provides

the following illustration of this provision:

> "A, an individual owning a 10-story office building, donates the rent free use of
> the top floor of the building for the year 1971 to a charitable organization.  Since
> A's contribution consists of a partial interest to which Section 170(f)(3)(A)
> applies, he is not entitled to a charitable contributions deduction for the
> contribution of such partial interest."

Id.

This example addressees the double tax benefit Section 170(f)(3) was enacted to

preclude.   In this type of situation, as outlined in the above regulation, the taxpayer would

receive a tax benefit of not collecting and claiming rent for the rental of the top floor of the

building by allowing the charity to use this rent free.  Additionally, the taxpayer is attempting to

obtain a double tax benefit by claiming a charitable contribution deduction for donating the floor

to the charity.  This is precisely the double tax benefit Section 170(f)(3) was to address.  *See*,

Stark v. Commissioner; Peters v. Commissioner.

In the instant case, the Plaintiffs never held their residence out as a rental or income

producing property.  Rather, it was their residence.  Thus, there can be no assertion that they are

receiving a double tax benefit because their residence was never ever used as an income

producing property.  Thus, under any interpretation, there is absolutely no double tax benefit to

the Plaintiffs.   Therefore, since that is the purpose for the enactment of Section 170(f)(3), it is

not applicable to the Plaintiffs' charitable contribution.

Although there are no cases or interpretations directly addressing the contributions of

structures to fire departments, the "partial interest "cases decided to date provide insight into

how this statute has been applied.  These cases involve donations by taxpayers that do not divest themselves of the dominion and control of the property but only provide the temporary use of the property with the expectation that the property will be returned to them intact.  In these types of situations, it is clear that taxpayers can obtain the double tax benefits Congress was attempting to preclude by enactment of Section 170(f)(3).  These cases and examples are clearly distinguishable to the contribution by the Plaintiffs in this case.

For example, in <u>Logan v. Commissioner</u>, TC Memo 1994-445 (1994), the taxpayer was not entitled to a charitable contribution deduction for the fair rental value of the portion of his garage that was used to house a county fire department vehicle.  The court held that the mere right to use the taxpayer's garage was the contribution of only a partial interest in his property and was precluded as a charitable contribution by Section 170(f)(3).  The taxpayer was receiving a double tax benefit of not claiming any rent for the use of the portion of the garage and also claiming a charitable contribution deduction.  <u>Id</u>.  Similarly, the IRS opined that no deduction was allowed where the taxpayer contributed a week's use of his vacation home to charity (which auctioned it off at a fund raising event).  It was determined that this contribution was less than the taxpayer's entire interest in the property.  There, the taxpayer would receive a double tax benefit by not claiming any rental income for that week and also claiming a charitable tax deduction.  Rev. Ruling. 89-51, 1989 C.B. 89.  In another case, the taxpayer's contribution of a mobile educational unit to the Colorado State Chiropractic Society was determined to be a limited use contribution because the taxpayer really did not divest dominion and control over the vehicle to the organization.  <u>Stjernholm v. Comm'r</u>, 10th Cir. No. 90-9012, 1991 U.S. App. LEXIS 11639 (10th Cir. May 22, 1991).

In the instant case, the Plaintiffs did not retain any interest, dominion or control in their residential structure once they contributed it and turned it over to the Fire Department on June 29, 2004.  The Fire Department had complete control over the property at that time and could do whatever they wanted to the property, including completely destroying it and burning it down to the ground.  It was intended and contemplated that the Plaintiffs gave away all rights, interests, dominion and control they had in the residential structure.  When they contributed the residence, it was habitable.  When they were given the right to access the property after the burn exercises were completed some five months later on October 29, 2004, there was no structure remaining. Hence, the value of the donation to the Fire Department was completely consumed.  It was completely consumed and destroyed by the Fire Department in their training and burn down exercises.  In fact, the Hendrixes were required to remove the debris at their own expense.  Once the contribution was made, the Hendrixes no longer had any rights whatsoever to the structure. They gave it completely away and had no dominion or control over what the donee Fire Department chose to do with the property.

The primary legislative purpose of I.R.C. §170(f)(3) is the prevention of the double tax benefit.  Thus, with that application, it is clear that this provision was not intended to apply and should not apply due to the overwhelming public policy reasons discussed below in determining the deductibility of their charitable contributions because they did <u>not</u> provide rent-free premises to a charity.  The donation of their residential structure was not an income producing property for the Plaintiffs and thus the donation did not shield the Plaintiffs from income recognition. Moreover, there were no limitations or restrictions on what the Fire Department could or could not do with the residential structure.  In fact, they had the absolute right to destroy it in its entirety by demolishing it and burning it down to the ground.  This is in fact what they

42

eventually did with the structure. The Plaintiffs gave the Fire Department their complete interest in their residence for purposes of fire training and burn down exercises. The Plaintiffs retained no substantial interest in this residential structure. Accordingly, this statute was not enacted to cover the broad reach to prevent the charitable donation of property to a community fire department.

In addition to the above, the fact that Section 170(f)(3) does not apply to these types of charitable contributions is also illuminated by the IRS' position in prior tax controversies regarding similar charitable contributions. Specifically, the Tax Court previously decided cases regarding the legitimacy of charitable contributions involving donations of less than the entire fee simple estate. In these cases, the IRS and the Tax Court never discussed or challenged these contributions on the basis of a partial interest contribution. For example, in <u>Arbor Towers v. Commissioner</u>, T.C. Memo 1999-213 (1999), the Tax Court was faced with determining whether a corporate taxpayer could take a charitable contribution deduction for the bargain sale of a building with a land lease. Specifically, the taxpayer sold the Wolverine Tower, a building, along with a land lease to the University of Michigan. <u>Id</u>. The taxpayer claimed that the sale was a bargain sale and took a deduction for the difference in the fair market value and sale price. <u>Id</u>. The IRS, and subsequently the Tax Court, disallowed this deduction based upon a determination that no bargain sale occurred. The IRS did not argue, and the Tax Court did not discuss, whether this "donation" was also prohibited under §170(f)(3) as a partial interest. See also, <u>Kaplan v. Commissioner</u>, T.C. Memo 2006-16 (2006).

**B. <u>The Hendrixes Contributed Their Entire Interest to the Upper Arlington Fire Department.</u>**

As discussed above, the basis for the IRS's denial of the charitable contributions made by the Hendrixes is that the application of I.R.C. §170(f)(3) prevents a charitable contribution

deduction for a donation of a partial interest in property. Accordingly, if this section is applicable, in order for a taxpayer to receive a charitable contribution deduction, they must make a donation of their <u>entire</u> interest in their property. The IRS erroneously contends that the Hendrixes only donated a partial interest, or the use of their property.

This myopic view by the IRS is erroneous because the Hendrixes contributed their entire residential structure to the Upper Arlington Fire Department. The IRS apparently assumes that the structure cannot be separated from the underlying real property. The IRS position is contrary to Ohio law. Under Ohio law, a residential structure is recognized as a separate and distinct interest from the underlying real property. For purposes of this analysis, it is important to recognize that for purposes of federal income taxation, state law determines the property rights and federal law determines how these property rights are taxed. <u>United States v. National Bank of Commerce</u>, 472 U.S. 713, 727 (1985); <u>Drye v. U.S.</u>, 528 U.S. 49, 58 (1999). Accordingly, if state law deems a taxpayer to maintain a separate interest in a residential structure from that of the land, this should be treated as such for federal income tax purposes.

Ohio property law does not specifically lay out provisions detailing whether a separate fee interest exists in a dwelling house that is separate and apart from the underlying land. However, through comparison to similar property interests and a review of the state courts' interpretation of these property rights and interests, it can be shown that a separate property interest can exist between a dwelling house and the underlying land. Moreover, the innate structure of property taxation in Ohio is based upon separate appraised values of structures and land. As a pertinent example here, in determining the value of the structure for this charitable contribution, Mr. Hendrix accessed the Franklin County Auditor's website and determined the appraised valuation of the land for property tax purposes. This Auditor's website information is

identified in <u>Exhibit H</u>.  This clearly shows a breakdown for property tax purposes between the structure and the land.  Thus, if the structure is burned down or destroyed and the homeowner fails to replace the structure the property taxation will only be based upon the value of the land.  Similarly, when the Hendrixes built their new home, their new taxes are based upon the value of the land and the substantially increased value of their residential structure.

Ohio property law has long recognized the leasehold interest in land.  A leasehold is a common real property estate used typically for commercial real property transactions.  See for example, Ohio Revised Code §5311 on condominium ownership and real property interests.  Typically, a leasehold transaction involves the ownership of a land by one fee simple owner and an ownership of the building by another fee simple property owner.  The fee simple building owner will own the entire home or structure but will only own a leasehold interest on the land beneath it.  A leasehold interest differs from a fee simple interest in that with a fee simple interest, the landowner requires ownership of the entire property including both the land and the buildings.  In these leasehold transactions, the fee owner of the land and the fee owner of the buildings are considered to have separate freehold estates for purposes of property law.  The leasehold interest analogy provides that a landowner can have an interest in solely the land and another, separate and distinct individual, can have completely separate interest solely in the residential structure or building upon the land.  Accordingly, this analogy provides support for the assertion that a dwelling house is a separate and distinct interest and land.

Secondly, the Supreme Court of Ohio in <u>Cincinnati College v. Yeatman</u>, 30 Ohio St. 276 (1876), held that there may be several and distinct tenements or properties within the same building, under the same roof as well as where one is over the other as where one is beside the other.  <u>Id.</u> at syllabus ¶1.  Specifically, <u>Cincinnati College v. Yeatman</u>, involved the application

by the Cincinnati College to compel the Auditor of Hamilton County to transfer from its name a portion of the property that it leased to the Mercantile Library Association for a period of 10,000 years to be renewable forever.  Id. at 284.  Specifically, the Cincinnati College donated to the Mercantile Library Association the second floor of the College.  Id.  This contribution was made by way of a leasehold for a period of 10,000 years to be renewable forever by the Library Association.  The Cincinnati College claimed that it was no longer the owner of the second story and should not be taxed by the Auditor.  The Ohio Supreme Court first contemplated whether the Mercantile Library Association would be required to pay taxes.  Id. at 282.  In making this determination, the Ohio Supreme Court held that there may be distinct and separate estates in land and structures thereon by other than vertical lines.  Id.

The Ohio Supreme Court in Yeatman based this holding on analogies to other property interests.  Specifically, the court found that if the owner of land grants the trees growing thereon to another and his heirs, with the right to cut and carry them away at his pleasure, forever, the grantee acquires an estate in fee in the trees, with an interest in the soil sufficient for their growth, while the fee in the soil remains in the grantor.  Id. at 282.  Additionally, the Ohio Supreme Court compared this to the cases of mines and quarries where there may be double ownership, one in the mines, the other of the soil, each held by distinct and independent titles.  The court also held that a dwelling house may be the subject of ownership in fee, although its owner may have no further interest in the land on which it stands than the right to have it remain there; and when they hold such an estate in single chamber in such a house.  Id.  In conclusion, the Ohio Supreme Court held that the Library Association held a permanent leasehold estate in the second story of the Cincinnati College building and that this was a distinct and separate estate and land.  Id.

The Ohio Supreme Court's holding in <u>Cincinnati College v. Yeatman</u>, is applicable in defining property rights for the State of Ohio.  Accordingly, applying this holding to the instant case, it is clear that the Hendrixes have a separate and distinct interest in the dwelling house that is separate and distinct from their interest in the land.  Accordingly, the Hendrixes donated their entire interest in their residential structure when they contributed their dwelling house to the Upper Arlington Fire Department.

The Hendrixes gave away complete dominion and control of the residential structure to the Fire Department.  They did not provide a temporary use or right of enjoyment of the structure to the Fire Department nor did they have any rights at all on what to direct or control what the Fire Department could do with the property after they contributed it to the Fire Department on June 29, 2004.  Rather, this determination on how to handle or treat the property after it was contributed was solely and wholly the Fire Department's determination.  This was clearly and expressly spelled out in the Burn Contract.  Specifically, the Burn Contract provided that after the contribution the Fire Department had complete and unbridled dominion and control over the property.  This was a completed gift as the Plaintiffs lost any further control whatsoever over the property upon its donation.   The Plaintiffs retained no rights over the donated structure whatsoever. Thus, they donated their entire interest in the residential structure with their donation.

**C       The Hendrixes Did Not Merely Allow the Fire Department to "Use" the Structure.**

Alternatively, with its contention that I.R.C. Section 170(f)(3) applies, the IRS contends it is applicable because the Taxpayers only gave the Fire Department the "use" their residential structure.  In light of the express terms of the Burn Contract which provides that the Fire Department had the right to essentially demolish the property and burn it down to the ground and

47

in light of what actually transpired here in that the property was totally destroyed and burned down to the ground, it is difficult to comprehend how the IRS can credibly assert that the Plaintiffs only allowed the Fire Department the use of their residential structure.  Yet, this is precisely a basis for the IRS asserting that I.R.C. Section 170(f)(3) is applicable to this transaction.  The Plaintiffs suspect that the possible genesis for this theory comes from the June 29, 2004 Burn Contract.  In the first sentence of the contract, it states that "[t]he property owner(s) hereby grants permission to the Fire Department, City of Upper Arlington, Ohio to use said property and structure(s) located at:  2580 Sherwin Road – Upper Arlington, Ohio 43221 – Franklin County."   Regardless of that rather generic provision, the contract also provides that:

> "The structure is to be burned and/or demolished as seen fit by the Fire Division for said training.  The property owner(s) acknowledge that once the training exercise begins and during the exercise that the property owner(s) has no authority to direct or control Fire Division actions in this matter.  The property owner(s) acknowledges that the structure may be partially damaged or fully destroyed by burning or other means prior to its release to the owner(s) following the training."

Regardless of this express provision and the fact that the structure was in fact burned down to the ground and completely demolished, the IRS asserts that the Taxpayers only let the Fire Department to "use" this structure.  This is nonsense.  Under any definition of the word "use," it connotes a temporary borrowing with the expectation that the property will be returned in the same condition that it was loaned out for use.  The Merriam Webster Dictionary defines the word "use" as including (in the verb tense) "the legal enjoyment of property that consists in its employment, occupation, exercise, or practice" and provides the example that "she had the use of the estate for life".  Certainly, this dictionary definition does not contemplate the complete destruction of the property as a "use".

In Upper Arlington Fire Chief Ross' deposition, he was asked to explain his understanding of the word "use" is in the context of the "Burn Contract" versus in a general context.  Ross Dep. 49:1-18.  Chief Ross explained that usually the word "use" generally connotes that the property would be returned in the same condition as when it was received. Ross Dep. 49:4-8.  However, he agreed that the use of the word "use" in the Burn Contract was not meant to give the Hendrixes an expectation that they would get their property back in the same condition for which they turned it over.  Ross Dep. 49:9-15.  In fact, Chief Ross indicated that all of the parties had similar expectations that the property would and could be burned down to the ground pursuant to this contract.  Ross Dep. 49:16-18.

Similarly, with regard to this general use concept, Captain Nofziger testified that if he uses something, he would return it back in the same way as he found it.  Nofziger Dep. 121:10-14.  He pointed out that with regard to the residential structure donated by the Hendrixes, the Upper Arlington Fire Department was <u>not</u> going to return the property back to the Hendrixes in the same condition in which they received it.  Nofziger Dep. 122:6-12.  In fact, they were going to – or had the right to, demolish the property and have the right to burn it down to the ground. <u>Id</u>.  Further, he testified that the property was habitable when they received it and the property was not habitable when they returned it to the Hendrixes.  Nofziger Dep. 122:10-12.  Therefore, he testified that in his personal opinion, the word "use" in the burn contract, and as they understood the burn itself, is not being used in the general term of that word.  Nofziger Dep. 122:13-17.  I.R.C. Section 170(f)(3) and its temporary right to use concept does not contemplate situations such as here where there is intended to be a total relinquishment of the structure and the entire destruction of the contributed property.

Based upon the foregoing, it is clear that the inclusion of the word "use" in the Burn Contract did not mean that the City of Upper Arlington was only going to "use" the property and then return it to the Hendrixes after the fire training exercises. Actually, all parties to the Burn Contract understood that the Hendrixes were giving the City of Upper Arlington their home to destroy and burn down for purposes fire training exercises and that they would not be getting their home back after the completion of these exercises. Accordingly, the Government's contentions that the contribution deduction is prohibited based upon the City of Upper Arlington Fire Department's "use" of the property, is both nonsensical and erroneous. The Hendrixes gave the Upper Arlington Fire Department their residential structure to destroy and completely burn down. Accordingly, the Hendrixes gave everything they had to give with respect to the residential structure with no expectation of getting anything in return from the City of Upper Arlington. As such, the Hendrixes are entitled to a charitable contribution deduction.

## VI. SUBSTANTIATION & DOCUMENTATION REQUIREMENTS FOR A CHARITABLE CONTRIBUTION

The last issue to be determined in this portion of the case is whether the Plaintiffs complied with the substantiation requirements of Section 170 related to their 2004 charitable contribution deduction. Specifically, after the Hendrixes initiated this action, the IRS asserted that the Hendrixes allegedly failed to comply with the I.R.C. §170 requirements (1) by failing to include within the written acknowledgement from the City of Upper Arlington Fire Department a statement regarding any goods or services that were provided by the City to the Plaintiffs in consideration for their contribution as required by I.R.C. §170(f)(8)(A), and (2) that the appraisal obtained by the Hendrixes from qualified real estate appraiser Ann Ciardelli failed to include some of the required information as set forth in Treasury Regulation §1.170A-13(c). The Government's position is that these alleged failures would result in the disallowance of the

claimed charitable contribution.[5]  Accordingly, the remaining issue is whether these alleged failures are consequential to the Hendrixes' charitable contribution deduction.

### A.  <u>Substantiation & Documentation Requirements</u>.

The Internal Revenue Code provides specific rules and regulations regarding the documentation and substantiation required for all charitable contributions.  These documentation and substantiation requirements are heightened for charitable contributions of more than $5,000.  With regard to these compliance requirements, I.R.C. §170(f)(11)(c) provides that in the case of contributions of property for which a deduction of more than $5,000 is claimed, the requirements are met if the individual, partnership, or corporation obtains a qualified appraisal of such property and attaches to the return for the taxable year in which such contribution is made such information regarding such property and such appraisal as the secretary may require.  Treasury Regulation §1.170A-13(c) provides that for deductions in excess of $5,000, the taxpayer must comply with the following three requirements: (1) obtain a qualified appraisal, (2) attach a fully completed appraisal summary to the tax return on which the deduction for the contribution is first claimed (or reported) by the taxpayer, and (3) maintain records containing information required by Section 170, including a written acknowledgement from the charity acknowledging receipt of the contributed property from the taxpayer.

### 1.  Qualified Appraisal Requirement.

---

[5] As stated above, this is the first time in the entire controversy with the IRS that these issues have been raised. Specifically, the Taxpayers' charitable contribution was initially challenged and disallowed by the IRS Revenue Agent on the basis of I.R.C. §170(f)(3) that prohibits a deduction for contributions of a partial interest. Subsequently, the Hendrixes challenged the proposed disallowance of the charitable contribution with the IRS Office of Appeals.  The IRS issued a Notice of Deficiency again setting forth the sole basis for its disallowance of the Hendrixes' contribution as the partial interest provisions of I.R.C. §170(f)(3).  Finally, after paying the tax related to the charitable contribution, the Taxpayers also filed a claim for refund that was subsequently disallowed. At no point during the administrative audit and appeal did any representative of the IRS challenge or question the Taxpayers' compliance with the substantiation requirements of I.R.C. §170.

As set forth above, the Treasury Regulations require that for all charitable contribution deductions in excess of $5,000, the taxpayer must obtain a qualified appraisal of the property donated.  Treas. Reg. §1.170A-13(c)(2).  A qualified appraisal is an appraisal document that is not made earlier than 60 days prior to the date of contribution of the appraised property, nor later than the due date of the return on which the deduction is first claimed.  Treas. Reg. §1.170A-13(c)(3).  The qualified appraisal must be prepared, signed, and dated by a qualified appraiser and must include the following eleven (11) criteria concerning the contributed property and appraisal:

> (A)      A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that is or will be contributed.
>
> (B)      In the case of tangible property, the physical condition of the property.
>
> (C)      The date (or expected date), of the contribution to the donee.
>
> (D)      The terms of any agreement or understanding entered into by or on behalf of the donor or the donee that relates to the use, sale, or other disposition of the property contributed, including, for example, the terms of any agreement or understanding that
>> (1)      Restricts temporarily or permanently a donee's right to use or dispose of the donated property.
>> (2)      Reserves to or confers upon, any right to the income from the contributed property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire, or
>> (3)      Earmarks donated property for a particular use.
>
> (E)      The name, address, and the identifying number of the qualified appraiser; and, if the qualified appraiser is acting in his or her capacity as a partner in the partnership, an employee of a person, or an independent contractor engaged by a person other than the donor; the name, address, and taxpayer identification

> number of the partnership or the person who employs or engages with qualified appraiser.
>
> (F)     The qualifications of the qualified appraiser who signs the appraisal including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations; a statement that the appraisal was prepared for income tax purposes;
>
> (G)     A statement that the appraisal was prepared for income tax purposes;
>
> (H)     The date (or dates) on which the property was appraised;
>
> (I)     The appraised fair market value of the property on the date of the contribution;
>
> (J)     The method evaluation to determine the fair market value, such as the income approach, the market data approach, and replacement cost plus depreciation approach; and
>
> (K)     The specific basis for valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

Treas. Reg. §1.170A-13(c).

Importantly, the qualified appraisal report does **not** need to be appended to the federal income tax return on which the charitable contribution deduction is taken.  Rather, the taxpayer is only required to maintain the appraisal report in his/her records until requested to produce it by the IRS.  Accordingly, unless an audit is initiated, the IRS never sees or relies on the qualified appraisal report in determining whether to allow a charitable contribution.

In addition to meeting the eleven criteria with respect to the actual qualified appraisal, the Treasury Regulations also require that taxpayers attach an appraisal summary on IRS Form 8283.  Treas. Reg. §1.170A-13(c)(2)(i)(B).  This appraisal summary must be attached to the tax return on which the deduction of more than $5,000 was first claimed.  The appraisal summary must be

53

signed and dated by the donee and by the qualified appraiser who prepared the qualified appraisal, and must include twelve (12) descriptive and informational criteria (some of which are also required in the qualified appraisal discussed above).  Treas. Reg. §1.170A-13(c)(4).

The Hendrixes hired and relied upon David Shealy, a certified public accountant, to assist them in preparing and filing their 2004 federal income tax return.  Based upon the complexities and nuisances associated with the charitable contribution deduction, the Hendrixes relied on the advice and guidance provided by their accountant.  Mr. Shealy instructed the Hendrixes that they needed to obtain an appraisal of the property that was contributed to the City of Upper Arlington Fire Department.  Accordingly, the Hendrixes hired Ann Ciardelli, an appraiser from R.F. Berger & Associates, to appraise their charitable contribution to the City of Upper Arlington.  Ann Ciardelli is a qualified real estate appraiser who holds herself out to the public as an appraiser and regularly performs and completes appraisals on real property, such as the Hendrixes.  Ann Ciardelli, upon coming up with the fair market value of the Hendrixes' residential structure and land, prepared a detailed appraisal report.  A copy of this appraisal report is appended hereto as Exhibit G.  The Hendrixes obtained this appraisal well within the time period proscribed in Treasury Regulation §1.170A-13.  Additionally, the report clearly identified Ann Ciardelli and Ralph Berger as the appraiser and reviewer of the appraisal report.  The report included their names, license numbers, phone numbers and address.  This appraisal report also included a very detailed description of the land and an explanation of the comparables used to determine the fair market value of the Hendrixes residential structure and land.

In addition to providing all of this information in the qualified appraisal report, the Hendrixes also complied with the appraisal summary report requirements of Treas. Reg. §1.170A-13(c)(2)(i)(B) by filing a IRS Form 8283 with their 2004 federal income tax return.  A

copy of this form is appended hereto as <u>Exhibit U</u>.  This form readily identified the type of

donation and deduction that the Hendrixes made to the City of Upper Arlington Fire Department.

It clearly identified Ann Ciardelli as the appraiser of the property and how she determined the

value of the contribution.  Importantly, this form was attached to the Hendrixes federal income

tax return and flagged this contribution for the IRS' review.  Attached to the form was a copy of

the burn contract and a signed acknowledgement from the City of Upper Arlington that they

received this structure as a contribution.

In addition to notifying the IRS of their contribution through the attachment of IRS Form

8283 to the 2004 federal income tax return, the City of Upper Arlington also separately notified

the IRS of this contribution.  Specifically, the City also separately notified the IRS by letter dated

January 12, 2005 attaching a copy of IRS Form 8282 to notify the IRS that the Hendrixes

residential structure was contributed to the City in 2004 for fire training exercises.  This letter

and form is appended hereto as <u>Exhibit T</u>.

In addition to obtaining the necessary written acknowledgement, the City of Upper

Arlington also filed IRS Form 8282 (<u>Exhibit T</u>).  This form identified that the structure was

donated and was destroyed as part of fire training exercises.  Attached to the form was a copy of

the June 29, 2004 Burn Contract and an acknowledgement from the City notifying the Hendrixes

that the fire division exercise was concluded and control of the site/property was being returned

to them.  The Plaintiffs' 2004 return contained all of the necessary information and

documentation to satisfy the requirement of I.R.C. §170(f)(8).  Specifically, the Burn Contract

that was appended to the Hendrixes' 2004 federal income tax return satisfied the written

acknowledgment requirements.  Thus, based upon all of these forms and documents presented to

the IRS in connection with this donation, it is difficult to fathom that the IRS did not receive

clear and unambiguous notice of the precise nature and use of this donated structure and charitable contribution.

Despite all of the information contained within the appraisal report from Ann Ciardelli and the appraisal summary (IRS Form 8283) and the Form 8282, the IRS contends that the Hendrixes failed to comply with the strict requirements of Treasury Regulation §1.170A-13(c). The Government's arguments in this regard must fail because the Hendrixes did comply with the intent and purpose of the law.  They relied upon their competent and capable tax advisors to ensure that all of the requisite information was included and obtained with respect to their charitable contribution.  With the exception of a few, very minor items, the Hendrixes did comply with these requirements.  Furthermore, and most importantly, all of the information that the Hendrixes provided to the IRS effectively conveyed the nature and basis for their charitable contribution.

### 2. Written Acknowledgement Requirement.

In addition to the qualified appraisal and appraisal summary, the Internal Revenue Code and Treasury Regulations also provide that the taxpayer must obtain and attach to the return a written acknowledgement from the charity receiving the contribution.  I.R.C. §170(f)(8)(A). Specifically, Section 170(f)(8)(B) explains that this written acknowledgement must include (i) the amount of cash and a description (but not value) of any property other than cash contributed; (ii) statement regarding whether the donee organization provided any goods or services in consideration for the contribution, and (iii) a description and good faith estimate of the value of any goods or services contributed.

The IRS contends that the Hendrixes failed to meet this requirement because the written acknowledge (i.e. Burn Contract and Addendum to Burn Contract) did not specifically state the

goods and services, if any, that the City of Upper Arlington provided in consideration for the Hendrixes' contribution. The IRS's position is erroneous because the Hendrixes satisfied the written acknowledgment requirements of I.R.C. §170(f)(8). Specifically, the Burn Contract was executed by the City of Upper Arlington Fire Department and the Hendrixes to memorialize <u>all</u> of the terms and conditions of the Hendrixes' contribution. A copy of the Burn Contract is appended hereto as <u>Exhibit J</u>. The Burn Contract clearly and unambiguously set forth all the terms and conditions of the donation including what the property would be used for, and all the warranties of the Hendrixes regarding the condition of the home. There were no terms or conditions of the parties' agreement regarding the Hendrixes' charitable contribution that were not included with the Burn Contract and subsequent addendum.

Ohio law, and specifically the parol evidence rule, prohibits parties from imputing terms into an unambiguous written contract. Specifically, under Ohio law, when parties memorialize their agreement in writing, the terms and conditions set forth in the written agreement will generally constitute the final agreement of the parties. The Ohio Supreme Court has repeatedly held that where the terms in an existing contract are clear and unambiguous, courts may <u>not</u> create a new contract by finding intent not expressed in the clear language of the written contract executed by the parties. <u>Alexander v. Buckeye Pipeline Co.</u>, 53 Ohio St. 2d 241, 246 (1978); <u>Shifrin v. Forest City Ent.</u>, 64 Ohio St. 3d 635, 638 (1992). Accordingly, if no ambiguity exists on the face or within the four corners of the written contract, no parol evidence may be considered in an effort to demonstrate such ambiguity. Specifically, Ohio courts generally presume that the intent of the parties to a contract resides within the language they chose to employ within their written agreement. <u>Kelly v. Medical Life Insurance Co.</u>, 31 Ohio St. 3d 130, *paragraph one of syllabus* (1987); <u>Schifrin</u>, 64 Ohio St. 3d at 638

As such, and pursuant to Ohio law, <u>no</u> other terms or conditions may be imputed to the parties.  Specifically, the Government (IRS) cannot contend that the City of Upper Arlington intended to provide goods or services in exchange for the Hendrixes' contributions other than the goods and services specifically provided for in the Burn Contract and subsequent addendum.

Pursuant to Ohio law, the Burn Contract was a final and complete statement of the parties' agreement.  As such, no additional agreements between the parties (including an agreement that the City provide goods or services to the Plaintiffs) can be inferred.  Therefore, because the Burn Contract does <u>not</u> include any covenants on behalf of the City of Upper Arlington regarding services in consideration for the Plaintiffs' contribution, then no such agreements or services were provided.  Accordingly, the written acknowledgment obtained and appended to the Plaintiffs' 2004 federal income tax return (i.e. Burn Contract and Addendum) satisfied the requirements of I.R.C. §170(f)(8).

## B.    <u>Substantial Compliance Doctrine</u>.

Alternatively, the Plaintiffs contend that if this Court were to find that they did not strictly comply with all of the documentation and substantiation requirements of I.R.C. §170, that they nonetheless ***substantially complied*** with these requirements for purposes of being entitled to a charitable contribution deduction.  Specifically, the Plaintiffs alternatively contend that they substantially complied with all of the substantiation and documentation requirements of I.R.C. §170 and related Treasury Regulations and are therefore entitled to the 2004 charitable contribution deduction.

The "substantial compliance" doctrine is an equitable doctrine designed to avoid hardship in cases where a party has done all that can reasonably be expected, to comply with the statutory requirements but has failed to strictly comply.  The courts, however, are careful to only apply the

doctrine where it would not defeat the policies underlying the statutory provisions.  Sawyer v. County of Sonoma, 719 F.2d 1001, 1008 (9th Cir. 1983); see also Baccei v. United States, N.D. CA No. C 07-5329 PJH, 2008 U.S. Dist. LEXIS 50687 at *20 (N.D. CA June 26, 2008).  The United States Tax Court, Taylor v. Commissioner, 67 T.C. 1071, 1077-1078 (1977), observed:

> The test for determining the applicability of the substantial compliance doctrine has been the subject of a myriad of cases. The critical question to be answered is whether the requirements relate "to the substance or essence of the statute." Fred J. Sperapani, 42 T.C. 308, 331 (1964). If so, strict adherence to all statutory and regulatory requirements is a precondition to an effective election.  Lee R. Dunavant, 63 T.C. 316 (1974). On the other hand, if the requirements are procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly conduct of business, they may be fulfilled by substantial, if not strict, compliance. * * *

Id.; see also Estate of Gunland v. Commissioner, 88 T.C. 1453 (1987).

The United States Tax Court in Bond v. Comm'r, 100 T.C. 32 (1993), first applied the substantial compliance doctrine to charitable contribution deductions.  Specifically, Bond involved taxpayers who donated two blimps to a charity and claimed a charitable contribution deduction of $60,000.  Id. at 33.  The value of the charitable contribution was determined by a qualified appraiser who completed and signed the appraisal summary (i.e. IRS Form 8283), which was attached to the taxpayers' returns.  Id.

The government argued that this deduction was not allowed because the taxpayers failed to obtain and attach to their return a qualified appraisal report as required by Treasury Regulations §1.170A-13.  Id. at 35-36.  Specifically, the appraiser prepared and signed the IRS Form 8283, appraisal summary form, that identified the charitable contribution and his appraisal of the value of the two blimps.  Id. at 34.  However, the appraiser did not prepare a separate written appraisal of the two blimps other than that set forth on the IRS Form 8283.  Id.

The taxpayers, acknowledged that they did not strictly comply with the qualified appraisal requirements of Treasury Regulation §1.170A-13 but argued that they substantially complied with the requirements of the applicable statute and, therefore, qualified for the charitable contribution deduction under the doctrine of substantial compliance as set forth in Tara v. Comm'r, 67 T.C. 1071, 1077-1078 (1977).  Id. at 40.

In determining whether the substantial compliance doctrine applied to charitable contributions, the Tax Court held that it had to first determine whether the Treasury Regulation requirements were mandatory or directory with respect to its statutory purpose.  In so holding, the Tax Court held that "it is apparent that the essence of §170 is to allow certain taxpayers a charitable deduction for contributions made to certain organizations.  It is equally apparent that the reporting requirements of [Treas. Regs.] §1.170A-13, are helpful to respondent in the processing and auditing of returns on which charitable deductions are claimed.  However, the reporting requirements do not relate to the substance or essence of whether or not a charitable contribution was actually made."  (*Emphasis added*) Id. at 41.  Accordingly, the Tax Court held that the reporting requirements of Treas. Reg. §1.170A-13 were directory and not mandatory. The court further held that its conclusion was not altered by the fact that the Section 170(a) states that a deduction will only be allowed if verified under the regulations.  Rather, the court held that "[t]he fact that a Code provision conditions the entitlement of a tax benefit upon compliance with respondent's regulation does not mean that literal as opposed to substantial compliance is mandated."  Id.

In so holding, the Tax Court held that the taxpayers clearly made a donation of two airships during the taxable year, and that the subject of the donation was appraised at the amount claimed by the petitioners as a charitable deduction during the taxable year by a qualified

appraiser, and the donee was qualified to receive the charitable contribution.  Id. at 42.  The court found that with the exception of the qualifications of the appraiser, all of these facts appeared on the appraisal summary, IRS Form 8283, that was attached to the return.  Id.  Additionally, the Tax Court held that the appraiser's qualifications were promptly furnished to the government at or near the commencement of the audit.  Id.  The Tax Court distinguished this case from one in which the taxpayers failed to obtain a timely appraisal of the donated property and therefore failed to establish its value for claiming a contribution deduction on the return.  Id.

The Tax Court held that the taxpayers met all of the elements required to establish the substance or essence of the charitable contribution, but merely failed to obtain and attach the return a separate written appraisal containing information specified in the Treasury Regulations even though substantially all of the specified information, except for the qualifications of the appraiser, appeared in the IRS Form 8283 attached to the return.  The Tax Court concluded that the petitioner substantially complied with the Treasury Regulations and were entitled to the charitable deduction claimed.  Id.

As set forth above, the Government has recently claimed that that the Hendrixes charitable contribution should be disallowed on grounds that the Hendrixes failed to properly substantiate the contribution of their home to the Upper Arlington Fire Department.  Specifically, the Government suggests that the Hendrixes failed to obtain a written acknowledgment from the City of Upper Arlington specifically stating that no goods and services were provided in exchange for the Hendrixes contribution.  Additionally, the Government contends that the appraisal report from Ann Ciardelli did not strictly comply with the requirements of Treasury Regulation §1.170A-13(c) because it, among other things, failed to include the appraiser's background and qualifications.

61

The Government's position with respect to the Plaintiff's substantial compliance claims is presumably that this doctrine either does not apply or is inapplicable to the Plaintiffs contribution deduction.  Specifically, the Government seems to rely on a recent decision out of the District Court for the Northern District of Illinois in <u>Bruzewicz v. United States,</u> 604 F. Supp. 2d 1197 (N.D. IL 2009) as support for its position that the substantial compliance doctrine does not apply.  However, the Northern District of Illinois decision is not only distinguishable on the facts alone, it is also narrowly and strictly applies the substantial compliance doctrine contrary to the previous decisions of the United States Tax Court.

Specifically, the Northern District of Illinois, in determining whether to apply the substantial compliance doctrine, held, as first set forth by the Seventh Circuit in <u>Prussner v. United States</u>, 896 F.2d 218, 224 (7th Cir. 1990) that it owed no special deference to the Tax Court's legal views in application of the substantial compliance doctrine.  The Seventh Circuits "acid" test, and the court's review, ultimately lead to the determination that that taxpayer's neglect of some of the requirements of I.R.C. §170 could not be saved by the substantial compliance doctrine.

The holding in <u>Bruzewicz</u> clearly reveals the Northern District of Illinois and the Seventh Circuit's aversion to the Tax Court's substantial compliance doctrine.  Specifically, unlike the United States Tax Court, that has readily applied the substantial compliance doctrine, the Seventh Circuit places strict standards for its application.  Although the Sixth Circuit has not specifically ruled on the application of the substantial compliance doctrine, the Northern District of Ohio, in <u>F.E. Schumacher Company v. United States</u>, 308 F. Supp. 2d 819 (N.D. Ohio 2004), did consider and apply the substantial compliance doctrine.  Importantly, the Northern District of

Ohio applied the substantial compliance doctrine in a matter similar to the United States Tax Court in Bond v. Comm'r.

Specifically, the Northern District of Ohio did not apply the strict "acid test" of the Seventh Circuit, as explained in Bruzewicz.  Rather, the Northern District of Ohio, in determining whether the substantial compliance doctrine applied, held that "[t]he critical question to be answered for determining the applicability of the substantial compliance doctrine is whether the requirements relate to the substance or essence of the statute."  Id. at 833; *citing to* Taylor v. Commissioner, 67 T.C. at 1077.

Accordingly, the Government's contention that the substantial compliance doctrine does not apply, or that its application is restricted to only unimportant statutory requirements, is erroneous.  The substantial compliance doctrine should apply to the Hendrixes charitable contribution.  As such, and as enumerated by the United States Tax Court in Bond v. Commissioner, the regulation requirements of Treasury Regulation §1.170A-13 that the Hendrixes failed to comply with do not relate to the substance or essence of the charitable contribution statute.  As such, they could be fulfilled by the Hendrixes' substantial, rather than strict compliance.  The Hendrixes fairly and adequately obtained information regarding the nature and basis for their charitable contribution.  They clearly put the IRS on notice of their contribution.  As such, the Plaintiffs substantially complied with the requirements of I.R.C. §170 and Treasury Regulation §1.170A-13 and are therefore entitled to a charitable contribution deduction.

63

## <u>CONCLUSION</u>

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment should be granted and the Plaintiffs should be entitled to a full refund of the $125,053 plus interest paid as a result of the IRS' erroneous disallowance of their 2004 charitable contribution.

Respectfully submitted,

/s/ Terrence A. Grady
Terrence A. Grady (0020845)
Trial Attorney
Terrence A. Grady & Associates Co., L.P.A.
100 East Broad Street, Suite 2310
Columbus, Ohio 43215
Telephone:  614.849.0378
Facsimile:  614. 849.0379
Email:  tgradyattgradylaw.com
Attorney for Plaintiffs

# LIST OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| A | Columbus Dispatch Article |
| B | Picture from Fairfax County, Virginia Public Recognition Ceremony |
| C | Documentation of Initial Contact with Upper Arlington Fire Department |
| D-1 | Engagement Letter with Deloitte & Touche |
| D-2 | "Discussion Points" Outline Prepared by Deloitte & Touche |
| D-3 | IRS Forms & Publications Presented at March 12, 2004 Meeting with Deloitte |
| D-4 | Copy of United States Tax Court's Decision in Scharf v. Commissioner, presented at March 12, 2004 Meeting with Deloitte. |
| D-5 | Copy of the Hendrixes $675 Cancelled Check To Deloitte for Tax Consultation. |
| E | January 24, 2008 Affidavit From James & Lori Hendrix |
| F | February 22, 2008 Letter from David Shealy, CPA to IRS |
| G | May 25, 2004 Appraisal Report by Ann Ciardelli |
| H | July 30, 2004 Printout from Franklin County Auditor's Website |
| I | June 5, 2008 Appraisal Report by Ann Ciardelli |
| J | Burn Contract |
| K | Listing of all donated structures from 1988 through 2005 |
| L | Six-Page Pre-Burn Checklist for Hendrix Contribution |
| M | EPA Notification Application Prepared by Upper Arlington Fire Department |
| N | Captain Nofziger's Memorandum to Chief Ross |
| O | Captain Nofziger's "2580 Sherwin Road Live Burn Training" Report |
| P1-8 | Pictures from Live Burn |

| **Exhibit No.** | **Description** |
|---|---|
| Q | Letter from Upper Arlington Returning Access to Land |
| R | November 16, 2004 Letter from Fire Department to Hendrixes Thanking For Contribution |
| S | Hendrixes' Cancelled Checks Evidencing Payment of Upper Arlington Invoice |
| T | January 12, 2005 Letter to IRS with IRS Form 8282, Donee Information Return |
| U | IRS Form 8283 Appended to Hendrixes' 2004 Federal Income Tax Return |
| V | IRS Acquiescence |
| W | Tax Court Docket Sheet for Rolfs v. Comm'r. |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing Brief of the Plaintiffs James & Lori Hendrix in Support of their Motion for Summary Judgment was served electronically upon all parties of record this 16[h] day of February, 2010.


/s/ Terrence A. Grady
Terrence A. Grady, Esq.